## Richmond

LAYNE-ATLANTIC COMPANY v. KOPPERS COMPANY, INC.

January 14, 1974.

Record No. 8240.

Present, All the Justices.

*Robert G. Winters* (*White, Reynolds, Smith & Winters,* on brief), for plaintiff in error.

*William T. Prince; James T. Martin* (*Williams, Worrell, Kelly & Worthington,* on brief), for defendant in error.

HARRISON, J., delivered the opinion of the court.

Koppers Company, Inc. sought to recover a judgment against Layne-Atlantic Company in the amount of $14,580.95 for certain fiber glass well casing sold to Layne. The defendant denied liability, alleging failure of consideration and breach of warranty as to the fitness of the casing. Layne also counter-claimed against Koppers for damages alleged to have been suffered because of such breach. At the conclusion of all the evidence the trial court struck the evidence of Layne with reference to its counterclaim, and entered summary judgment for Koppers.

Involved here is an injection well which the United States Geological Survey desired to build in Norfolk. Its purpose was to test the feasibility of storing fresh water underground. The plans and specifications for sinking and piping the well were prepared by U. S. G. S. The contract was a fixed price one providing that if the well failed to produce water of a particular quality it would have to be abandoned and a new one drilled at the contractor's expense.

The specifications as originally drafted by Donald Brown, a geologist employed by U. S. G. S., provided that the topmost 230 feet of the well casing (hereinafter called pipe) be 18″ in diameter and the remaining pipe be 8″ in diameter. Brown consulted with Stuart Adler, a Koppers' representative, who recommended that the 18″ pipe be .5″ thick. All bids received on the original solicitations were rejected as too high.

U. S. G. S. then decided, after further consultation between Brown and Adler, to reduce the footage of 18″ pipe from 230 feet to about 125 feet and to reduce the wall thickness to .3″, thus effecting a savings in cost. The specifications were changed accordingly, and a new solicitation was issued. Layne's bid was accepted, and the contract was executed. Layne then purchased the pipe from Koppers.

There are numerous exhibits and voluminous testimony concerning the manner in which the well was to be constructed and the pipes installed. It suffices for our purposes to say that the well was 1010 feet deep. From the ground level down to a depth of about 85 feet, a 34″ diameter steel pit casing was cemented into place. Within the steel pit casing (as far as it extended) and from the ground level down to a depth of about 125 feet there was 18″ fiber glass pipe. From the level of 125 feet down to a depth of about 900 feet below the ground surface there was 8″ fiber glass pipe. From the 900-foot level to the level of about 1000 feet there was a stainless steel screen welded to the end of the 8″ pipe, and the last 10-foot section was a blank stainless steel pipe. A transition pipe was installed to effect the connection of the 8″ and 18″ pipes. The hole in which the pipe is installed is of necessity drilled larger than the pipe to be installed therein (36″ in diameter where the steel casing was to be installed, 32″ in diameter from the bottom of the casing to a depth of about 125 feet below land surface and 18″ in diameter from a depth of approximately 125 feet to the total depth). The space between the pipe and the side or wall of the hole is known as the annular space. Within the annular space, as well as within the installed pipe itself, drilling mud is used and

kept circulating by a pump during drilling operations. This mud must be of sufficient density to prevent a caving in of the walls of the hole.

The specifications provided that upon reaching the required depth of 1010 feet a filter pack (gravel) be placed extending from 5 feet below the bottom of the lowest stainless steel screen to 10 feet above the top of the uppermost screen; that on top of the filter pack there be placed a 10-foot layer of fine sand and silt to insure that the cement grout (to be thereafter emplaced on the layer of sand) did not infiltrate downward into the filter pack materials; and that after the filter pack, and the overlying 10-foot layer of fine sand were emplaced, the remainder of the annular space to the ground surface be filled with cement grout. The purpose of this grout is to support the pipe which it surrounds and eliminate external pressures upon the pipe.

The specifications further provided that the filter pack be installed as soon as possible after the casings and screens were installed, and that the contractor secure from the government representative approval of the method used to emplace the filter pack and of the manner in which the cement grout was to be injected into the annular space. It directed that upon completion of the screening, gravel packing and cementing, no work be done on the well for 24 hours after cementing is completed; and thereafter that the well be pumped and surged by air to clear it of mud and develop it.

The construction of the well, including the installation of all pipe, proceeded uneventfully through the emplacement of the required thickness of fine sand above the filter pack. It was at this point that employees of Layne "pumped the line". This is accomplished by pumping air into a 2″ line that was run into a 4″ fiber glass pipe injection line which paralleled the 18″ pipe for approximately 105 feet and was connected thereto by an L joint. The pumping lowered the water inside the 18″ pipe to a point 51 feet below the surface. At that time the water in the annular space outside the 18″ pipe stood at ground level.

The pumping continued for several minutes after the 51-foot measurement, and at this point a section of the 18″ pipe collapsed. The section that collapsed was about 39 feet long, the third section of the pipe from the top. As a result of the collapse the well had to be abandoned, cemented up and a new well constructed by Layne.

This controversy revolves around the amount of pressure exerted on the pipe and the fact that Layne "pumped the well" before filling

with cement grout the annular space between the pipe and the wall of the drill hole. Koppers contends that Layne's pumping the well prematurely was in violation of the contract and that such action produced excessive external pressures upon the pipe in that the water level on the inside of the 18″ pipe was lowered while the water and drilling mud in the 36″ annular space around the outside of the pipe remained at ground level. It says that the purpose of filling the annular space from the bottom of the well to ground surface with cement is to eliminate such pressure, for once the cement hardens it supports the pipe and reduces the pressure thereon to zero. This, it says, is the reason for the specification that the cement must set for 24 hours before the well is to be pumped.

Koppers further claims that Layne took a calculated risk and was in effect testing the well to see if it was producing and that it did this prior to the cement grouting to be in a position to salvage the pipe if the well had to be abandoned. After pipe is cemented it cannot be pulled out or reclaimed. Ralph Simmons, field supervisor of Layne and in charge of the construction, admitted that it would be "taking a gamble" to cement before pumping as called for in the contract. His explanation was: "Well, not trying to go against the contract, but that's a standard procedure with all well drilling. That is one of the main things that you do in any well regardless of what the contract calls for. . . ."

Robert R. Peters, Vice President of Layne, testified that the type of pumping that was done by his employees preceding the collapse of the pipe was a construction operation or procedure. He said: "[I]f you don't move some water in this area, then the material—the drilling fluid will set up as a jell and you can't get it out." Simmons agreed that the pumping done was "to partially get rid of the mud if any mud was in the screen lines", but he also said "so we could draw this water down and determine whether the well was producing".

T. L. Allen, Jr., employed by Layne as a well driller, admitted on cross-examination that at the time the pipe collapsed the pumping they were doing was "trying to develop the well", "bring in clear water" and "getting rid of some of the drilling fluid". He futher said that the measurement of water in the 18″ pipe made during the course of pumping told them "how far it is pulling it down and about what the well is doing", "whether it will hold the capacity of the well up or not", and "how much it pumps, how much the well would produce".

Layne says Koppers delivered pipe without supplying data on its

collapsing performance and characteristics. It admits that prior to the collapse no inquiry was made of Koppers for this information. Afterwards Peters did inquire, and Adler advised him that the 18″ fiber glass well casing used in the well had a calculated collapse pressure of 40 psi (pounds of pressure per square inch). Peters testified that drawing the water down as it did would have caused a pressure of approximately 22 psi on the 18″ pipe, whereas emplacement of the cement grouting would have subjected the 18″ pipe to 43 psi. However, the evidence is that the grouting should be injected in the annular space in four or five batches to avoid generating excessive pressure on the pipe. Further, the contract provided for the approval of the government representative as to the manner in which the cement grout was to be injected. Brown, the government representative, testified that he would not have approved emplacing the grout all at one time. He and Adler both said that grouting around the 18″ pipe was particularly critical and should be "babied through". It was Brown's impression that two batches of grout would be used in the lower 8″ section of the well and then 2 or 3 batches in the upper 18″ section.

Code § 8.2-315 provides:

"Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section . . . an implied warranty that the goods shall be fit for such purpose. . . ."

This statute embodies the rule in Virginia which has been enunciated in numerous cases. *See Gleason Co.* v. *Int'l Harvester*, 197 Va. 255, 88 S. E. 2d 904 (1955); *duPont Co.* v. *Universal Moulded Prod.*, 191 Va. 525, 62 S. E. 2d 233 (1950); *Greenland Corp.* v. *Allied, Etc., Co.*, 184 Va. 588, 35 S. E. 2d 801 (1945).

The "particular purpose" here is the purpose described in the contract between Layne and U. S. G. S. That purpose cannot be considered in isolation or divorced from the specifications of the contract. Koppers sold Layne pipe to be *installed* in an injection well *according to the specifications* and thereafter *to be used* in the *operation* of the well.

Layne does not contend that the pipe was defective or that it failed to meet specifications. Layne says that Koppers and U. S. G. S. had conferred and agreed as to the thickness of pipe and that Koppers

impliedly represented that the pipe was of sufficient strength to perform the job it was intended to perform. Layne says that having established that the pipe collapsed it established its right to recover from the seller.

The answer to this argument is that Koppers had no responsibility to supervise the construction of the well. It had a right to expect Layne to construct the well, including the installation of the pipe purchased from Koppers, in the manner specified in Layne's contract with U. S. G. S. Koppers considered the specifications and method of construction when it recommended the wall thickness of the pipe.

There is no suggestion that the pipe collapsed because of any defect in it, or any theory that it collapsed for any reason other than outside pressure that was excessive for a .3″ thick 18″ fiber glass pipe. The pressure occurred here when Layne drew down the water on the inside of the 18″ pipe prior to cementing and at a time and under circumstances not contemplated or permitted by the specifications. What Layne did may have been in accordance with the practices of the trade, but it was not in compliance with the specifications it agreed to follow in installing the pipe.

Layne, having failed to follow the specifications, cannot now be heard to say that, even had the well not been pumped prior to cementing, the pipe would have collapsed when the cement grouting was applied. This conclusion is pure speculation. We observe that had this occurred we would be confronted with a different case.

In *Whitin Machine Works* v. *United States*, 175 F. 2d 504 (1st Cir. 1949), the U. S. Maritime Commission ordered from Whitin a large number of generator sets for installation on Liberty ships. The specifications provided for a fly wheel that would operate at a certain number of revolutions per minute. One of the fly wheels "burst apart" while in operation. The government established a "little excessive porosity" in the casting of the fly wheel and alleged this as a "latent defect". The court found that the assumed "latent defect" destroyed neither the merchantability nor fitness for the particular purpose contemplated and afforded no basis for the government's recovery. The court held that the fly wheel burst apart when it was being used at speeds beyond what was contemplated for the particular purposes for which the engine was required, and under the terms of the Uniform Sales Act there was no implied warranty in the absence of such a defect.

In the case under review, there is also an absence of defect in the

pipe, and the seller's goods were being installed in a manner not contemplated when they were sold.

3 Williston, *Sales* § 488 (Rev. ed. 1948) provides:

> " 'If the seller's performance fulfills his obligation in regard to the quality of goods, whether because he has made no promises or warranties in regard to their quality or because those which he did make have been fulfilled, no question can arise as to his liability.' " 175 F. 2d at 509.

In *Marker v. Universal Oil Products Company*, 250 F. 2d 603 (10th Cir. 1957), the court held that the evidence was insufficient to raise questions for the jury as to whether a vessel was negligently designed by the defendant and was not reasonably safe for the persons working therein in the manner intended. Plaintiff's decedent was killed as a result of something that was done, a peril that ensued, "an occurrence not included in the vessel's design, nor necessary to its functional recharge". There was no evidence that the vessel was not standard in the industry nor that its design contained a latent functional defect. This case is of interest for the further reason that the court held that proximate cause was not established. There the plaintiff contended that his decedent would not have died had the vessel provided for an escape through side manways. The court found that there was no evidence that the decedent could have escaped in this manner, and further that the jury could only have speculated as to how long it would have taken to extricate the deceased under differently designed conditions. In the instant case the jury could only speculate as to whether or not the pipe would have thereafter collapsed at the time of cement grouting, as Layne claims.

*Brown v. General Motors Corporation*, 355 F. 2d 814 (4th Cir. 1966), is authority for the proposition that the rules of implied warranty apply only when the article is being operated or used in the manner intended for it. A manufacturer cannot be held to foresee an unanticipated or unpredictable misuse of the article it manufactures or sells. *See* 67 Am. Jur. 2d *Sales* § 468 (1973); 77 C. J. S. *Sales* § 325 (1952).

The occurrence which Layne maintains entitles it to bring an action for breach of an implied warranty for fitness arose while the pipe involved was being used (installed) in a manner not intended by Koppers or specified by U. S. G. S. Such action precludes its claim

against Koppers for breach of warranty. *See Eason* v. *Kelly Pipe Co.,* 16 Cal. App. 2d 88, 60 P. 2d 488 (1936).

Further, Layne fails to meet the second requirement of § 8.2-315 that the buyer rely upon the skill or judgment of the seller to select or furnish suitable goods. While it was within the contemplation of U. S. G. S. that "Koppers Fiberglass Casting" would be used in the well, the equivalent, if available, could have been purchased from another manufacturer. The sole connection of Koppers with the transaction prior to the contract was that it was consulted by U. S. G. S. as to the pipe thickness, and by Layne as to the cost of the pipe. Under these circumstances, the liability of Koppers was neither greater nor less than would have been the responsibility of any other company from whom Layne might have purchased the pipe.

The decision as to the thickness of the pipe represented the judgment and conclusion of U. S. G. S. as to the pipe needed for the well to be constructed. Layne ordered the exact pipe which the specifications called for, and Koppers supplied the pipe. So far as the record discloses this pipe would perform to the same degree and extent and as satisfactorily as would any other comparable fiber glass pipe .3″ thick, 18″ in diameter and 39 feet long. Layne did not inquire of Koppers regarding the collapse strength of the pipe. It assumed that the pipe specified in its contract with U. S. G. S. was the proper pipe to be used, and it proceeded to construct the well and install the pipe on that assumption. It offered no evidence that it relied upon the skill and judgment of Koppers, other than the fact that it used the Koppers product and that the company knew its intended purpose.

In the official comment under Code § 8.2-316 dealing with exclusion or modification of warranties is found the following statement:

"The situation in which the buyer gives precise and complete specifications to the seller is not explicitly covered in this section, but this is a frequent circumstance by which the implied warranties may be excluded. The warranty of fitness for a particular purpose would not normally arise since in such a situation there is usually no reliance on the seller by the buyer. The warranty of merchantability in such a transaction, however, must be considered in connection with the next section [§ 8.2-317] on the cumulation and conflict of warranties. Under paragraph (c) of that section in case of such an inconsistency the implied warranty of merchantability is displaced by the express warranty that the goods will comply

with the specifications. Thus, where the buyer gives detailed specifications as to the goods, neither of the implied warranties as to quality will normally apply to the transaction unless consistent with the specifications."

However, here there is no question as to quality or compliance with specifications by Koppers and no proof of defect. All we have is the fact that the pipe did collapse. We conclude that the collapse was occasioned by Layne's failure to follow the specifications during the construction of the well or because U. S. G. S. specified pipe be used of insufficient thickness and strength. In either event there can be no recovery by Layne from Koppers for breach of express or implied warranty. In view of this decision it is unnecessary that we consider the other assignments of error and cross-error. The judgment of the lower court is

*Affirmed.*