## Richmond

### THOMAS R. FEATHERALL

v.

### FIRESTONE TIRE AND RUBBER COMPANY, ET AL.

March 2, 1979.

Record No. 770864.

Present: All the Justices.

*Thomas P. Mains, Jr.*, for plaintiff in error.

*Francis J. Prior, Jr.; Richard H. Lewis; John J. Brandt (Robert L. Ellis; Norman F. Slenker; Siciliano, Ellis, Sheridan & Dyer; Brault, Lewis, Geschickter & Palmer; Slenker, Brandt, Jennings & O'Neal*, on briefs), for defendants in error.

COMPTON, J., delivered the opinion of the Court.

In this products liability case brought by a third-party user of certain items of equipment, we consider whether the respective manufacturers are liable in tort and for breach of warranty, whether the plaintiff's conduct bars his recovery, and whether certain evidence was properly excluded.

On July 30, 1971, plaintiff Thomas R. Featherall was severely injured on the premises of his employer, the Pepsi-Cola Bottling Company, located in Alexandria, when a stainless steel lid exploded from a syrup tank and struck him in the head. At the time, plaintiff was in the process of cleaning a soft-drink dispensing unit by means of a pressurized system. Among the components of the system were a cylindrical pressure tank containing carbon dioxide, a pair of pressure-reducing regulators with gauges, two flexible hoses, the syrup tank, the lid, and the drink dispensing unit.

Seeking recovery in damages for the injuries, plaintiff filed a motion for judgment containing counts in negligence and breach of warranty against Firestone Tire and Rubber Company, Steel Products Division Firestone Tire and Rubber Company, Firestone Steel Products Company (collectively Firestone), the manufacturer of the syrup tank; The Cornelius Company, Dispenser Products Division The Cornelius Company (collectively Cornelius),

the manufacturer of the lid; and Chudnow Manufacturing Company, Inc., the manufacturer of the regulators. Upon conclusion of plaintiff's evidence presented during five days of trial in December of 1976, the court below sustained defendants' respective motions to strike the evidence. We granted plaintiff a writ of error to the February 1977 final order entering summary judgment for defendants, which incorporated by reference a written opinion of the trial judge.

## The System

The usual function of a soft-drink dispensing system is to mix water, carbon dioxide and flavored syrup into a finished carbonated soft drink, which then flows through fawcets to be served in cups or glasses to customers. These systems are commonly used in public eating places. At the time of this accident, such a system had been set up in a work area on the premises of the plaintiff's employer and was being used to clean and service customers' soft-drink dispensing units. For cleaning, syrup was replaced in the system by water mixed with a cleaning agent and the pressure in the system was usually maintained at between 15 and 30 pounds per square inch (psi).

## The Pressure Tank

Standing on the floor of the work area was the pressure tank containing $CO_2$ under approximately 800 psi of pressure, called "source pressure." Affixed to the top of the pressure tank was a round knob which, when manually turned, permitted the gas to escape from the pressure tank. Except for providing source pressure for the system, the pressure tank was not involved in the accident.

## The Chudnow Regulators

Screwed onto a valve at the top of the pressure tank were two Chudnow dual-outlet pressure-reducing regulators, attached side by side and equipped with three pressure gauges. Each regulator had one operating gauge fixed above it. These gauges measured the amount of reduced pressure in the system. The third gauge, a tank pressure gauge, fixed to the side of the "outboard" regulator,

measured the pressure in the $CO_2$ tank. While several regulators could be fastened together to regulate pressure in more than one low pressure system using a single source of high pressure, in this case only one regulator was in use. Attached to the outlet fitting or "port" of the regulator which was positioned adjacent to the top of the pressure tank was a flexible hose running to a coupling on top of the syrup tank. No hose was affixed to the outlet port of the other regulator.

A spring mechanism inside the regulator metered the amount of pressure passing through the instrument. The position of the springs, and in turn the amount of pressure, was controlled by an adjusting screw mounted on the face of the regulator. As the screw is turned inward, with the use of a screwdriver, it progressively overcomes the tension of one spring inside the regulator, allowing gas at an increasingly higher pressure to pass through the regulator. As the screw is turned outward, the amount of pressure reduces. When the screw is at a full "out" position, no pressure flows through the regulator and system.

A locknut was attached to each Chudnow regulator when it left the manufacturer's control. The hexagonal nut was positioned on the screw between the head of the screw and the face of the conical regulator housing. The purpose of the locknut was twofold. First, the screw could be locked by use of the nut at a predetermined pressure shown on the gauge. Once the dispensing system had been set up in a restaurant, for example, and the proper mix of syrup and carbonated water had been established by a service mechanic, tightening the locknut would make it difficult for an inexperienced person to change the setting thereby altering the beverage mix. Second, use of the locknut kept the adjusting screw from being screwed in so deep as to render the spring mechanism inoperative from the standpoint of controlling the source pressure. Properly assembled and with the nut in place on the screw, the maximum pressure that could pass through the system would never exceed the capacity shown on the operating gauge, in this case 100 psi. But with the locknut removed from the screw and with the screw turned all the way "in", the record shows that the spring mechanism would be overcome and full source pressure would be allowed to enter the system. At the time of this accident, a locknut was not on the adjusting screw and, at that time, plaintiff was unaware of the foregoing characteristic of the regulator used in such a condition.

The interior spring mechanism of the regulator could be

changed to provide metering of pressure at different strengths, that is, 15, 30, 60, 100 and 300 psi. At the time of this accident, both regulators and associated operating gauges were for pressures of from 0 to 100 psi. The tank pressure gauge read from 0 to 2000 psi. Manipulation of the adjusting screws on the regulators after the system had been pressurized did not affect the reading on the tank pressure gauge; after pressurization, that device always showed the amount of pressure in the source tank.

### The Firestone Syrup Tank

Also standing on the floor in close proximity to the source pressure cylinder was a Firestone stainless steel tank with a two-and-one-half gallon soft-drink syrup capacity. The hose connecting the syrup tank and the regulator was five feet long.

The syrup tank was designed to receive a Firestone lid oval in shape and about three and one-half by five inches in size which had to be inserted at an angle into the top of the tank, then made parallel to the top of the tank and raised upward by a clamp. The escape of air was prevented by a rubber "O-ring" attached to the lid.

This tank could also accommodate a Cornelius lid which is slightly different in size and shape from the Firestone lid. With either lid in place, the tank could be pressurized.

### The Cornelius Lid

At the time of the accident, a Cornelius stainless lid was secured on the Firestone syrup tank. Built into the lid was a safety release valve which was designed to automatically allow $CO_2$ to escape if the pressure in the syrup tank exceeded approximately 130 psi. The valve could also be released manually. The valve failed to function automatically at the time of the accident.

The evidence showed that plaintiff's employer owned hundreds of lids and syrup tanks manufactured by both Firestone and Cornelius. When empty, these items were returned to the Pepsi-Cola plant for washing and refilling. No effort was made to separate the lids and tanks by manufacturer; Cornelius lids were frequently used to close Firestone tanks.

### The Soft-Drink Dispenser

The last component in the system was the dispensing machine, which was connected to the syrup tank by another flexible hose designed to carry the syrup. On the day of the accident a dispenser weighing approximately 250 pounds was positioned on a work table and water with the cleaning agent was to be run from the syrup tank through the dispenser to clean out accumulated syrup. The waste water was then to be collected in a container.

Other than being the object of the cleaning process, the dispenser played no part in the accident.

### The Accident

Due to his injuries, plaintiff could recall nothing about the events of the day of the accident or of the day before. Knowledge of the actual facts of the accident comes from Robert Glenn McGee, a 17-year-old high school student who had been employed by Pepsi-Cola for a short time as a "fountain repairman". Included in the duties of this apprentice worker was the responsibility of cleaning drink dispensing equipment. McGee worked primarily within the plant and had been performing his repair duties for about five months.

The plaintiff, approximately 37 years of age at the time of the accident, was employed by Pepsi-Cola as a mechanic to repair and service soft-drink dispensing equipment. Featherall had 12 years experience in that field of endeavor. He was very knowledgeable in the use and repair of all components in a typical dispensing system.

Plaintiff customarily worked outside his employer's plant servicing the equipment at customers' places of business. On the day of the accident, however, he was scheduled to work within the plant. He arrived about 10:00 a.m. and joined McGee in the work area where the accident happened. They attempted to pressurize a system, which had already been set up, in order to clean a dispenser.

The plaintiff testified that in order to pressurize a typical system after the pieces of equipment and hoses had been "hooked up" and cleaning water placed in the syrup tank, he would first "back out" the adjusting screws on the regulators "not knowing" exactly what the pressure settings had been when the regulators were last used.

Then he would "open up" the $CO_2$ tank and obtain a reading on the source tank pressure gauge. If the screws were in a full "out" position, the operating gauges would read zero. Next, with the $CO_2$ tank valve open, he would "adjust or turn in the adjusting screw on the regulator" until the desired pressure was reached and then lock it in place with the locknut.

At the time, McGee was trying to obtain a reduced pressure of 60 psi in the system but observed that the three gauges indicated that no pressure was present in the system. Assuming incorrectly that the $CO_2$ tank valve was open, McGee, using a screwdriver, turned "in" the adjusting screw on the regulator adjacent to the source tank. He believed that such action would permit the gas to flow from the source tank into the system to a pressure no greater than the maximum of 100 psi shown on the operating gauge. McGee believed that the outlet port of the other regulator was "plugged" to prevent gas from escaping; other evidence indicated it was not "plugged" but that the adjusting screw was in the "out" position. At the time, Featherall was a few feet away at the work bench, unable to get the cleaning solution from the syrup tank to flow through the dispensing machine.

As McGee continued to turn inward the adjusting screw, which lacked a locknut, the gauges continued to register zero. Then, Featherall "came over" and turned open the valve on the top of the $CO_2$ cylinder. Immediately all three needles on the gauges registered. Plaintiff and McGee then "laughed . . . about the tank not being on and [about] the needles how . . . they jumped quite rapidly." The needle on the inboard operating gauge registered a pressure in excess of its maximum of 100 psi. McGee did not recall what the other two gauges registered.

Next, the plaintiff walked back toward the work bench as McGee was in the process of turning the adjusting screw "out." McGee observed Featherall kneel over the top of the syrup tank. Then the Cornelius lid on the tank blew off with explosive force, striking the plaintiff on the right side of his face causing the severe injuries. Viewed in a light most favorable to plaintiff, McGee's testimony showed that only "a few seconds" elapsed after Featherall left his position beside the $CO_2$ tank and before the explosion occurred.

Grover C. Williams, a safety engineer employed to investigate the tragedy, arrived on the scene several hours after the accident happened and collected the component parts of the system. The setup had been dismantled before Williams arrived. At the time he

received the gauges and regulators, the gauge attached to the regulator which was affixed closest to the $CO_2$ tank registered over 100 psi and the other operating gauge read 40 psi. The tank pressure gauge registered zero. The adjusting screw on the inboard regulator was lacking a locknut and was "all the way in" in a "fully turned down position."

### Test Results Admitted

Conclusions from certain testing were received in evidence. Williams took the regulators, the gauges, the syrup tank and the top to Value Engineering Laboratory in Alexandria for study to determine the cause of the accident. There, the lid, which after striking plaintiff had ricocheted off the ceiling causing a dent in a ceiling timber, was placed on a new Firestone tank. The original tank had become distorted in the accident through excessive pressure, but the lid appeared to be undamaged. When the test tank was pressurized, the tank with lid held pressure and the safety release valve on the lid properly operated at approximately 130 psi. The interior parts of the two operating gauges were found to be damaged as the result of high pressure, accounting for the positions of the needles on those instruments. Likewise, a diaphragm and a tube inside the accident regulator had been damaged in the incident due to the high pressure. Before these regulator parts were repaired, source pressure from a $CO_2$ tank was infused through the regulator and pressure in excess of 800 psi was emitted.

### Ruling of the Trial Court

In a pre-trial order signed by all counsel without objection, the court below limited the substantive issues as follows: as to Firestone, negligent failure to warn that harm would result from the use of non-compatible parts, that is, attaching to a Firestone tank a Cornelius lid; as to Cornelius, the same negligent failure to warn as to use of mismatched components, negligent design of the lid and the pressure release valve, negligent failure to warn of such alleged defective construction, and breach of an implied warranty of fitness; and, as to Chudnow, negligent failure to warn as to safe handling (use of the adjusting screw without a locknut), negligent design of the regulator assembly, and breach of implied warranty of fitness. The pre-trial order stated that the defenses to the

foregoing claims were contributory negligence, assumption of the risk, misuse of the specific products, and that the products were not being devoted to their intended general use.

In a detailed written memorandum prepared after the decision to strike the evidence had been announced, the trial judge reiterated his earlier ruling that the results of certain additional tests, to be discussed *infra,* were properly excluded. The court then stated its reasons for striking the evidence as to Firestone and Cornelius because the proof was insufficient as a matter of law.

As to Chudnow, and also Cornelius, the court explained its ruling that the plantiff was guilty of contributory negligence which barred his recovery under the several tort counts. The court found that plaintiff, an experienced mechanic, acted without reasonable care when he took part in pressurizing the system when the locknut was missing from the adjusting screw and when he failed to ascertain that the screw was at the "off" position when the pressure was turned on.

In ruling adversely to plaintiff as to the warranty count against Chudnow, the court decided that the regulator was properly manufactured, that no defect existed when the instrument left the manufacturer's hands, and, further, that the regulator was "not used as manufactured and outfitted."

### Excluded Tests

The results of experiments are not admissible in evidence unless the tests were made under conditions which were the same or substantially similar in essential particulars to those existing at the time of the accident. *Habers v. Madigan,* 213 Va. 485, 487, 193 S.E.2d 653, 655 (1973); *Richards v. Commonwealth,* 107 Va. 881, 893, 59 S.E. 1104, 1108 (1908).

The plaintiff proffered evidence that in August of 1971 Value Engineering Laboratory obtained from Pepsi-Cola stock an identical "sample lid," presumably manufactured by Cornelius, attached it to a Firestone tank, and pressurized the unit up to 165 psi. Initially, the safety release valve did not function automatically. The valve was released manually and the unit was repressurized. On the second occasion, the valve operated automatically at 130 psi. According to the proffer, the expert who conducted the test would have testified that he "assumed that there may have been syrup in the area of the release valve" on the sample lid which

caused it to "stick" until activated manually. From this evidence, plaintiff wanted to prove that the safety release valve installed on the lid at the time of the accident was not reliable unless "you manually purge it from time to time" and that both Cornelius and Firestone should have warned of such a condition.

We believe the trial court properly excluded that evidence. The record shows that the lid in place at the time of the accident had been used over a considerable period of time, perhaps as much as two months, in a cleaning process when a cleansing solution, not cola syrup, was in the syrup tank. Such fact makes the condition of the test lid apparently clogged by syrup substantially different from the accident lid which had been subjected to a prolonged cleaning process. The result of a test conducted under such conditions was thus inadmissible.

Almost two years later in April of 1973, the Value Engineering expert conducted another series of tests using a new Firestone tank, a set of new Cornelius lids, and a set of both old and new Firestone lids. The tank was closed with a Firestone lid and the safety release valve "capped" so it would not operate. The unit withstood extremely high pressure, but at about the 500 psi level the rubber gasket around the entire edge of the lid extruded allowing the gas to escape. When the same procedure was employed with a Cornelius lid, that gasket did not release and the lid separated from the tank with explosive force when the pressure had been at 650 psi for approximately ten seconds. Plaintiff sought to prove by this experiment that the Firestone tank with a Cornelius lid was an "extremely dangerous combination."

The record also showed, however, that a difference of 1/32 inch existed between the size of the tested Cornelius lid and the accident lid. During the proffer, the expert testified that such a dimensional difference "could affect the separation" of the lid from the tank. Again, we think the trial court properly ruled that such condition during testing was substantially different from the accident condition and rendered the results of that experiment inadmissible. The foregoing determination having been made, the test run using the Firestone lid becomes inadmissible as being irrelevant.

During the third day of the 1976 trial, plaintiff moved the court to permit him to conduct a test during an appropriate recess of a Cornelius lid which that defendant had been using as an exhibit. Counsel for plaintiff claimed surprise when the dimensional difference in the lid tested in April of 1973 was pointed out

during the hearing. The accident lid had been lost and plaintiff wanted to use the available exact duplicate to determine during trial "whether the dimensional difference was in fact significant."

We believe the trial court properly sustained the objections of Firestone and Cornelius to this motion. Adequate opportunity for pre-trial discovery had been available during the pendency of the suit. A spur-of-the-moment test in the midst of the trial would have afforded defendants no reasonable time to evaluate any conclusions of plaintiff's expert made as a result of such a test nor given defendants a chance to run equivalent tests using the same part. Also, the accident lid had been available and had been tested in 1971 by the expert called as a witness by plaintiff. Consequently, we find no abuse of discretion in the trial court's action.

### Firestone's Liability

Plaintiff's claim against Firestone was that it failed to warn of a potentially dangerous condition which it knew or should have known existed when a Cornelius lid was used to seal a Firestone tank. Plaintiff states that the sole basis of such claim lay in the evidence to be revealed in the excluded tests which, he says, would have shown "that the use of a Cornelius lid with a Firestone tank, when over-pressurized, caused an explosion such as that which injured plaintiff . . . ." We have already determined the tests were properly excluded. Thus nothing further needs to be said to elaborate on our view that summary judgment was properly entered in favor of Firestone, there being insufficient evidence to establish a prima facie case against that defendant.

### The Liability of Cornelius

On appeal, plaintiff says that the following issues are to be decided as to Cornelius. Did plaintiff establish prima facie a case of failure to warn of a dangerous condition connected with the use of the product, *i.e.*, mixing a Cornelius lid with a Firestone tank, a case of negligent design, or a case of breach of warranty of fitness for the intended use? He argues that the gravamen of his claim against Cornelius is "based upon two items of proof: first, that using a Cornelius lid with a Firestone tank created a potentially dangerous condition which was neither known to plaintiff, nor obvious; and second, that Cornelius represented that its safety release valve

contained in the lid was a safety device, which would open at approximately 135 psi pressure, preventing excessive or unintended pressure in the syrup tank, and that, at the time of the accident, the valve clearly failed to operate."

We turn first to the claim of failure to warn. The maufacturer of a chattel will be subject to liability when he

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

*Restatement (Second) of Torts* § 388 (1965); *see* Annot., 76 A.L.R.2d 9.

The duty to warn stems from the view that the manufacturer should have superior knowledge of his product and it extends not only to the immediate purchaser but to other persons who might in the ordinary and natural course of events be subjected to danger. 2 R. Hursh & H. Bailey, *American Law of Products Liability* § 8:11, at 170-71 (2d ed. 1974). Nevertheless, there is no duty to warn in respect to a product which is not in fact dangerous, *id.* § 8:13, at 175, and no such duty exists when the product is used "in an unlikely, unexpected or unforeseeable manner." *Id.* § 8:16, at 185.

In the present case, there was no sufficient proof that the Cornelius lid or safety release valve was dangerous or that any dangerous condition existed which may have resulted from the manufacture of the piece. Indeed, one of plaintiff's witnesses affirmed that, in his experience, Cornelius lids "did a good job for what they were intended to do". From the mere happening of an accident, we will not conclude that the product was inherently dangerous. Also, there was no evidence that Cornelius had actual or constructive knowledge that its lids were being used with Firestone tanks, or that if they were so used the combination failed to function properly. Moreover, the evidence does not raise any inference that it was likely, expected or foreseeable by Cornelius that the lid and safety valve would be employed in a prolonged cleaning process. From the evidence, we know nothing of the

effect, if any, of the chemical properties in the cleaning solution as opposed to cola syrup on the components of the lid and safety valve. Thus the evidence utterly failed to establish any duty upon Cornelius to warn under these circumstances.

■ The plaintiff's evidence is likewise inadequate upon the question of negligent design. The manufacturer is not required to supply an accident-proof product. *Turner* v. *Manning, Maxwell & Moore, Inc.*, 216 Va. 245, 251, 217 S.E.2d 863, 868 (1975). Other than the fact that the accident happened, the only evidence touching that issue came from plaintiff's expert who testified: "The design of the safety release valve with the exit port was adequate." Contrary to plaintiff's assertion in his reply brief, we construe that testimony as being related to the fitness of both the valve *and* the exit port (an opening in the valve to allow gas to escape), not just to the exit port alone. Also, even though the plaintiff testified that there was rubber-to-metal contact when the pressure relief valve was closed which could cause "sticking" and resulting failure of the valve to release, plaintiff was disqualified as an expert on that subject and his opinion excluded.

Plaintiff's subsequent lay testimony on the subject of rubber "clinging" to metal was inconclusive and insufficient to support a prima facie showing of faulty design. And too, it will be remembered that the accident lid, apparently undamaged, functioned properly and according to specifications when tested after the accident.

■ Plaintiff's breach of warranty claim against Cornelius must also fail for many of the same reasons to which we have already adverted. Here, there was an implied warranty of merchantability that the lid with safety valve was reasonably fit for the purposes of providing closure for a Cornelius tank and for pressure release during a soft-drink dispensing operation. We can also infer from plaintiff's evidence that there was an implied warranty of fitness for the same specific purpose. Thus, there is here no distinction between the implied warranty of merchantability and the implied warranty of fitness for a particular purpose. *See* Jaeger, *Warranties of Merchantability and Fitness For Use: Recent Developments,* 16 Rutgers L. Rev. 493, 506-07 (1962).

Under these warranty theories, the burden was upon the plaintiff to show "(1) that the goods were unreasonably dangerous either for the use to which they would ordinarily be put or for some other reasonably foreseeable purpose, and (2) that the unreasonably dangerous condition existed when the goods left the

defendant's hands." *Logan* v. *Montgomery Ward & Co.*, 216 Va. 425, 428, 219 S.E.2d 685, 687 (1975). And there can be no recovery against the manufacturer for breach of these implied warranties when there has been an unforeseen misuse of the article supplied. *Layne-Atlantic Co.* v. *Koppers Co.*, 214 Va. 467, 473, 201 S.E.2d 609, 614 (1974); *see Turner* v. *Manning, Maxwell & Moore, Inc.*, 216 Va. at 252, 217 S.E.2d at 869.

In the present case, as we have already said, the evidence fails to show that these products manufactured by Cornelius were defective when they left that defendant's hands. Plaintiff argues that the unreliability of the pressure release valve was established by proof that the device operated properly when tested after the accident but failed to function at the time of the accident. He argues "that a safety device that only works fifty percent of the time is not a proper safety device . . . ." We do not agree with that logic as applied to the legal principle involved here. The mere happening of the accident and subsequent proper functioning of the valve does not establish prima facie that the device was defective when it left the maufacturer's hands. In fact, there was evidence tending to show that the pressure release valve had been repaired, and a part replaced with another part made by an unknown manufacturer, after the valve had left the control of Cornelius.

Moreover, there was misuse of these products, as previously noted. The proof fails as a matter of law to show directly or inferentially that Cornelius should have foreseen or reasonably anticipated that the lid with valve would be mismatched with another manufacturer's tank or employed in a long-term cleaning operation. We know from the record that the lid and valve were designed for use with a Cornelius tank in a soft-drink dispensing process. We also know that at the time of this accident, the products were not being used in such a manner but instead the lid was being used on a Firestone tank as a part of a prolonged cleaning process. While these parts and this system may customarily have been used in the trade in this manner to clean the dispenser, there is no evidence of this. Even though it may be reasonable to infer that Pepsi-Cola at its Alexandria plant habitually cleaned the dispensers in this way, we will not assume from the facts of this one incident of use and Pepsi-Cola's course of conduct either that such use should have been expected by Cornelius or that such was a proper use of this equipment which was designed, according to this record, to be employed with

another tank and for an entirely different purpose.

## Chudnow's Liability

Plaintiff asserts that Chudnow negligently failed to give a warning as to the safe use of the regulator, negligently designed the instrument and breached an implied warranty of fitness for a particular purpose. We see no merit in the claim of negligent design or breach of warranty. There is no evidence that when the regulator in question left the control of Chudnow with the locknut in place on the adjusting screw that the product was mechanically defective. Indeed, all of the plaintiff's evidence was to the contrary and revealed that the regulator functioned according to specifications, properly performing its particular purpose of pressure reduction. With the locknut in place, source pressure did not enter the system. Rather, the higher pressure was reduced, when the locknut was employed, to a force no greater than the maximum amount shown on the associated operating gauge which, in turn, monitored the pressure controlled with the aid of the regulator's internal spring mechanism. Even without the locknut, the regulator functioned as designed, according to the plaintiff's evidence. Not until the adjusting screw was turned all the way "in" did the spring mechanism become immobilized and allow full source pressure to flow undiminished through the regulator and into the system. While this latter condition was not the intended result from normal use of the device, nevertheless such different result was not caused by any defect inherent in the design or construction of the product. We cannot say on this evidence that Chudnow was negligent in failing to provide an adjusting screw which could not have been removed from the regulator housing, thus preventing removal of the locknut. Nor do we believe any implied warranty existed to cover use of the product in an altered condition without the locknut. Consequently, the plaintiff's case aganst Chudnow fails on that tort count and on the contract theory.

But we do not reach the same conclusion on plaintiff's assertion that Chudnow negligently failed to warn against the dangerous condition created by use of the regulator without the locknut affixed on the adjusting screw. The evidence established the following important facts related to that issue.

The product was supplied with the locknut in place on the screw. The nut performed a distinct safety function; it prevented the adjusting screw from rendering the spring mechanism inoperative.

The screw and, in turn, the nut could be easily removed from the device. Without the locknut, the screw could be readily tightened so as to overcome the pressure-reducing ability of the regulator. When such inhibiting feature of the instrument had been rendered useless, extremely high pressure could flow into a system closed, in part, by flexible hoses of unknown strength and by a removable steel lid. The plaintiff was not aware of the result created by full depression of the adjusting screw used without a locknut. He was unaware that full source pressure could ever enter the system being regulated by a 100 psi spring mechanism when a locknut was not in use. To be reasonably inferred from the evidence is the fact that, at least, *a* proximate cause of the explosion was that excessive pressure entered the system. And, finally, there was evidence that no warning or notice of the dangerous condition created by use of the product without a locknut was given by Chudnow.

From the foregoing important facts, as well as the state of the record as a whole, we believe the plaintiff established a prima facie case against Chudnow of negligent failure to warn. Chudnow contends there was no duty to warn because the regulator, as manufactured, was reasonably safe for its intended purpose or for any other reasonably foreseeable purpose. That assertion is, of course, correct as far as it goes. But as we have already noted, a manufacturer will be subject to liability if he "knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied. . . ." *Restatement (Second) of Torts* § 388 (1965). We think Chudnow could have reasonably foreseen the danger which was inherent in the product when sold, that is, that the regulator would likely be used not as manufactured but without the locknut, given the facility with which the nut could be removed from the instrument. As to Chudnow, misuse was foreseeable. *See* 1 L. Frumer & M. Friedman, *Products Liability* §§ 8.01 & 8.05[1], at 186.6(6) (1978). This foreseeable misuse is in marked contrast to the unanticipated misuse of the Cornelius lid. No admissible evidence was offered to show that the rubber gasket around the lid performed a safety function which failed when mismatched with a Firestone tank. Chudnow knew the nut in place served a safety function. That knowledge, according to the record, was not made available to potential users of the product. This failure to warn, we believe, constituted negligence which proximately caused the explosion and plaintiff's injuries, and the trial court erred in finding to the contrary.

In passing, we note that while there was a general misuse of the

Cornelius products because they were employed in a prolonged cleaning process, no such general misuse was being made of the Chudnow regulator. Even though cleaning fluid was in the syrup tank, the general function of the regulator in reducing gas pressure was unchanged.

## Plaintiff's Conduct

In view of our decision as to Chudnow, we turn to its claim that the trial court correctly ruled that Featherall was guilty of contributory negligence as a matter of law.* Defendant argues that Featherall, an experienced mechanic, acted unreasonably in the following particulars. Contrary to usual custom, he turned on the $CO_2$ tank valve without determining whether the adjusting screws were set in an "off" position. He failed to ascertain that locknuts, which were readily available in the work area, were in place on the screws. He failed to notice that the adjusting screw had been turned all the way "in". He did not promptly close the $CO_2$ valve when the gauges abruptly registered. He failed quickly to activate manually the pressure release valve when he knew or should have known the system was overpressurized.

We do not agree that, as a matter of law, the plaintiff's conduct contributed to his injury. Critical to our determination of this issue is the testimony, first, that on the day of the accident Featherall was unaware that full source pressure would pass through a regulator of this type which lacked a locknut and, second, that he was unaware that the locknut served a safety function. At the time, McGee, positioned to control the regulator, had manipulated the adjusting screw. Plaintiff merely moved to the $CO_2$ tank, turned it on, observed the gauges, stepped back to the work bench, and a few seconds later knelt over the syrup tank, perhaps trying to manually release the pressure valve on the lid. Given the testimony that plaintiff did not know of the safety purpose of the nut or of the dangerous condition caused by its absence, we think reasonable minds can differ whether plaintiff failed to act properly and promptly and whether such failure was a cause of his injury. Thus, we think the trial court erred in finding that as a matter of law plaintiff was guilty of contributory negligence.

For these reasons, the order appealed from will be affirmed as

* The court below did not rule on the issue of assumption of the risk.

to Firestone and Cornelius. It will be reversed as to Chudnow and the case remanded for a new trial as to that defendant only on the issues of negligent failure to warn, contributory negligence, causation and damages.

*Affirmed in part,*
*reversed in part,*
*and remanded.*