## CIRCUIT COURT OF FAIRFAX COUNTY

Tim Martin

v.

Nordic Group
of Companies, Ltd., et al.

January 13, 2003

Case No. (Law) 188486

BY JUDGE ARTHUR B. VIEREGG

The captioned case came before me for oral argument of Plaintiff Tim Martin's Motion for Sanctions. Oral argument took place on January 3, 2003, after which I took the matter under advisement. At the conclusion of the hearing, I ordered that a transcript of the arguments be prepared and filed. Furthermore, Mr. Mims, counsel for Plaintiff Martin, requested and was granted leave to file the Rule 4:5(b)(6) deposition transcripts of Flambeau's designee, Mr. Ruchti, and another deposition of a witness, Ms. Meyer, who was not designated by Flambeau as its Rule 4:5(b)(6) designee. He indicated he would cite pertinent testimony. Flambeau's counsel, Mr. DeCaro was afforded leave to cross-designate portions of the deposition. Thereafter, without leave of court, both sides filed additional letters containing additional arguments. None of the arguments contained in these letters were requested; none have been considered by me in issuing this letter opinion. I am now prepared to deliver my decision.

14

## I. *Facts*

### A. *Facts Alleged*[1]

In July 1998, Plaintiff Tim Martin's father, John Martin, purchased a new lawn mower manufactured by Defendant Rich Manufacturing Corporation ("Rich"). Defendant Flambeau Products Corporation manufactured a plastic gasoline tank and shut off valve assembly. Flambeau Products Corporation sold the assembly to Rich, which mounted it on the mower. Rich sold the mower to Defendant UTECO, Inc., who in turn sold the mower to Defendant Morton's, a retail seller. Morton's sold the mower to John Martin, and therefore performed services and repairs for him. Defendants Nordic Group of Companies, Ltd., Flambeau Corporation, and Flambeau Products Corporation (collectively, "Flambeau") are corporate affiliates engaged in manufacturing, designing, marketing, and distributing gasoline fuel tank systems for use as component parts on lawn mowers and other machines.

On September 13, 1998, Plaintiff Tim Martin ("Martin") was using the mower when he noticed fuel leaking from the underside of the fuel tank. Martin attempted to turn the shut-off valve to the "off" position. Leaking gasoline or fumes caught fire and exploded, severely burning him.

### B. *Requests for Production of Documents and Interrogatories*

On May 30, 2000, Martin filed his Motion for Judgment, advancing Breach of Warranty claims against Defendants Flambeau, Rich, UTECO, and Morton's as well as Negligence claims against Defendants Flambeau, Rich, and Morton's. Trial in the case is scheduled for March 10, 2003.

On June 8, 2000, Martin served his Motion for Judgment, as well as his First Set of Interrogatories and his First Request for Production of Documents, on Flambeau. Among the documents requested were quality assurance files and documents pertaining to prior lawsuits, claims, or incidents associated with plastic fuel tanks or fuel tank assemblies.

On November 20, 2000, the Honorable Henry E. Hudson of this Court ordered Flambeau to file responses to the outstanding discovery within twenty-one days of receipt of a request by Martin. It is not clear from the record why Judge Hudson required a second request in view of Martin's

---

[1] The "Facts Alleged" section is taken from those alleged in the Motion for Judgment.

earlier service of interrogatories and document requests. A review of the file suggests a second request may have been ordered to facilitate settlement negotiations. In any event, no pleadings were filed by either party between November 20, 2000, and December 14, 2001.

On September 27, 2001, Martin again requested Flambeau to respond to his First Set of Interrogatories and First Request for Production of Documents. When Flambeau again failed to respond, Martin moved to compel the requested discovery. On December 28, 2001, the Honorable Jonathan C. Thatcher ordered Flambeau to respond to the First Set of Interrogatories and First Request for Production of Documents within twenty-one days. Flambeau still failed to provide discovery responses.

On January 25, 2002, Martin filed a Motion for Sanctions seeking a default judgment because of Flambeau's continued discovery violations. On February 15, 2002, however, the parties submitted *an agreed order* stating "unless Defendants Nordic Group and Flambeau fully answer Plaintiff's First Set of Interrogatories and produce all documents responsive to Plaintiff's First Request for Production of Documents on or before 12:00 p.m. on Thursday, February 21, 2002, this Court will enter a judgment by default against them pursuant to Rule 4:12(b)(2)(C) of the Rules of the Supreme Court of Virginia." This order was entered by the Honorable Kathleen H. MacKay on that date.

On February 15, 2002, Flambeau produced answers to the interrogatories; it produced the requested documents the following week. Ralph Boccarose, Flambeau's previous counsel passed away in June of 2002. On or about June 14, 2002, present counsel, Mr. Jeffrey DeCaro, made his appearance in the case.

On August 16, 2002, Martin filed a Motion to Determine Sufficiency of Answers to Requests for Admission and for Sanctions and to Compel. Martin sought entry of a default judgment based on Flambeau's refusal to admit that it did not have documents relating to quality control and inspection of the fuel tanks, although it had produced none in accordance with Judge MacKay's February 15, 2002, order. On September 6, 2002, the Honorable Jane Marum Roush denied Martin's motion, apparently in view of Mr. DeCaro's relatively recent appearance, in other words because he had not had adequate time to become acquainted with the circumstances surrounding Flambeau's responses to Martin's discovery requests.

16

C. *Rule 4:5(b)(6) Depositions*

On November 22, 2002, Martin took a Rule 4:5(b)(6) deposition of Flambeau's corporate designee Tony Ruchti, as well as the deposition of Flambeau sales manager Alyce Meyer. Among the twenty-seven areas Flambeau was noticed for deposition were:

> "Inspection and/or testing of the Martin fuel tank for leaking, and/or for thickness flaws which could foreseeably lead to leaking, prior to drilling the hole in the bottom for the bushing and shut-off valve, including all documents memorializing such inspection/testing and the identities of all employees involved in such inspection and/or testing and their roles"; "All reported incidents of problems with fuel tanks and fuel tank assemblies sold by Flambeau Corporation during the period 1990 to present, including but not limited to reported leaking and/or improper installation of the bushing and shut-off valve or cap design, and the identities of employees with knowledge thereof and all documents related thereto"; "Changes made by Flambeau Corporation after learning of Tim Martin's injuries in its procedures for fabricating fuel tanks, assembling fuel tank systems, packing and shipping, and quality assurance for each, the time of such changes, and the reasons therefor"; "Conversations and other communications between or among employees/agents of Flambeau Corporation, and/or its affiliates, upon receipt of notice of the September 13, 1998, incident in which Tim Martin was injured, including the substance of the conversations, persons present, and documents relating thereto"; "All other procedures for product quality assurance which were applicable to the Martin fuel tank, all documents memorializing that procedure, the identity of all employees involved in formulating and carrying out the procedure, any changes to the procedure after fabrication of the Martin fuel tank, and the reasons for such changes."

Four days earlier, Flambeau had for the first time produced a June 16, 1997, letter from Ferris Industries notifying Flambeau of two lawn mower fires involving the Flambeau gas tank assembly which is the subject of this action. The pertinent part of the letter states:

Last month, after a second Ferris Mower burned up because of gas leaking, we learned that a Kelch gas cap we have been using since October 1995 for new, wide mouth, Flambeau plastic gas tanks, is not uniformly venting according to our design. It became apparent from our subsequent testing that this lack of proper venting can cause a failure in the containment of fuel, thereby producing a potential fire hazard. The failure occurs at the bottom of the tank. An earlier incident in August 1996 was investigated, however, at that time, we deduced that it was a random occurrence.

We are conducting a full scale recall of the approximate 4000 gas caps that have been sold with the particular models, and, although our mowers are only for commercial use, we are notifying the Consumer Protection Service Commission as a courtesy.

During the deposition, Mr. Ruchti was unable to answer questions related to several subjects noticed for the deposition, and he also testified that he had taken few steps to investigate the matters as to which he had been designated to testify to.

Excerpts taken from Mr. Ruchti's and Ms. Meyer's depositions include the following:

[Page 15:] Q. The testing protocol, I have not seen that in any of the documents that have been produced, the protocol that would have been in effect for this particular tank. Should that be in existence somewhere?
A. Yes.
Q. Do you know where that would be?
A. It should be at Flambeau.

[Pages 19-20:] Q. Do you know what the tolerance is of that tank with regard to how much pressure it will withstand before it fails?
A. No.
Q. Do you know if that has ever been tested?
A. No, I don't know.

[Page 51:] Q. Have you made an investigation to see whether or not other people have been burned or injured in connection with

18

gas vessels that you have sold that have been used on lawn mowers?

A. I have not.

[Page 60:] Q. Is that what Ms. Meyer told you, that she has investigated this?

A. Yeah. There was no further evidence, so I was assuming there was no personal injury.

Q. Ms Meyer told you that she followed up and investigated this allegation on the June 16, 1997, letter and determined that there was no personal injury. Is that correct?

A. No. I did not ask that question.

[Page 61:] The Witness: Do I know if Alyce Meyer investigated if there was a real personal injury?

Q. Investigated anything about the June 16, 1997, letter.

A. No, I do not.

[Page 66:] Q. What efforts were taken by Flambeau Corporation to learn more about the specifics of this leak?

A. I don't know the answer to that.

Q. In fact, you don't know if any efforts were taken, do you?

A. I don't know either way.

[Page 81:] Q. With regard to your quality control and your testing of these fuel tanks, at any time, including present, do you have any statistics, or does the company have any statistics regarding failure rate?

A. Yes.

Q. When did you start keeping those statistics?

A. I'm not sure of that date. I would have to look and see.

Q. Do you know what the rejection percentage is on these tanks?

A. No, I do not.

[Page 199:] Q. Did anyone at Flambeau contact anyone at Kelch industries regarding the recalled fuel caps?

A. I do not know.

[Pages 135-36:] Q. Does Flambeau keep any complaint logs or records of complaints made by customers?

A. Uh-huh.

Q. Where do they keep those?

A. Quality control.

Q. Did you review quality control's records related to any complaints by any of your customers?

A. No, I did not.

Q. Do you think if you had reviewed those documents in that file, you would have found additional complaints?

A. I don't know that.

[Page 193:] Q. You saw the Ferris letter of June 16, 1997?

A. Yes.

Q. Did you ever talk with Steve Lusignan, John Whalen, Mark Meadows, Bill Flint, or Mike Filkins regarding the Ferris letter?

A. No, I did not.

[Page 195:] Q. Do people in your company keep files?

A. Yes.

Q. Do individuals tend to make memos from time to time regarding conversations or investigations they may make?

A. Uh-huh.

Q. Did you make any inquiry to see whether anybody might have any notes regarding any communications they had had with Ferris regarding the June 16, 1997, letter?

A. Other than Alyce Meyer.

From Ms. Meyer's Deposition:

[Page 7:] Q. Did you ever check the quality assurance files for any documents?

A. No.

Q. You do have a quality assurance department. Is that correct?

A. Yes, we do.

[Page 112:] Q. Who had independent testing done?

A. Flambeau.
Q. Where are those test results?
A. I would assume in the quality files.

## D. *Martin's Motion for Default Judgment*

On December 19, 2002, Martin filed the present motion considered for entry of a default judgment, *inter alia*, as a Rule 4:12(b)(2) sanction on account of Flambeau's failure to produce quality assurance files and test results related to the Martin incident, for producing the earlier false sworn response to his interrogatory asking for prior claims or complaints, and for producing a corporate designee who was unable to answer questions on issues designated for examination, including prior accidents and claims, and quality assurance documents.

At the hearing, Martin's counsel, Mr. Mims, argued that the repeated discovery failures in this case have prejudiced the Plaintiff's ability to investigate the claims and that, for more than two and a half years, Flambeau had not produced a letter demonstrating notice to Flambeau of a fuel tank flammability problem. Counsel further argued that the February 15, 2002, Order, *agreed upon* by opposing counsel required Flambeau to produce "all documents" responsive to Martin's discovery requests or suffer the entry of a default judgment.

In addition, Martin's counsel argued that because of the recently discovered letter from Ferris industries, Martin is attempting to obtain information about Ferris from the Consumer Protection Agency which will take up to thirty days. Martin claims that because the trial is in March 2003, this delay has prejudiced his ability to prepare for trial.

Mr. DeCaro, Flambeau's counsel, argued that the letter was not a claim or complaint and should not be a basis for entry of a default judgment. He also argued that he is producing the requested documents as quickly as possible and argued that a default judgment was an extreme sanction and should not be imposed under the circumstances of this case.

## II. *Applicable Rules of Court*

Rule 4:12(b)(2)(C) of the Rules of the Supreme Court of Virginia provides in pertinent part:

> If a party or an officer, director, or managing agent of a party or
> a person designated under Rule 4:5(b)(6) or 4:6(a) to testify on

behalf of a party fails to obey an order to provide or permit discovery, including an order made under subdivision (a) of this Rule or Rule 4:10, the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following: An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party.

Rule 4:5(b)(6) provides:

A party may in his notice name as the deponent a public or private corporation or a partnership or association or governmental agency and designate with reasonable particularity the matters on which examination is requested. The persons so designated shall testify as to matters known or reasonably available to the organization. This subdivision (b)(6) does not preclude taking a deposition by any other procedure authorized in these Rules.

Rule 4:5(b)(6) parallels Federal Rule of Civil Procedure 30(b)(6).

### III. *Decision and Analysis*

Plaintiff Martin sought information, *inter alia*, pertinent to Flambeau's notice of defects in the type of mower gas tank assembly that Flambeau had introduced into the public stream of commerce. Such information relates to core issues in most, if not all, product liability cases. *See, e.g. Featherall v. Firestone*, 219 Va. 949, 962, 252 S.E.2d 358 (1979); *Jones v. Ford Motor Co.*, 263 Va. 237, 253, 559 S.E.2d 592 (2002). Accordingly, it was incumbent upon Flambeau to provide such information in full and in a timely manner. When Flambeau failed to meet these discovery duties, it was ordered not once, but twice, to do so.

Pursuant to Rule 4:12(b)(2)(C), a judge may enter a default judgment when a party has failed to comply with an order compelling it to produce discovery. *See, Brown v. Black*, 260 Va. 305, 534 S.E.2d 727 (2000). However, a court may impose less drastic sanctions. And, as Flambeau argues, some federal courts have observed that entry of a default judgment should be confined to the most flagrant cases. *Wilson v. Volkswagen of Am., Inc.*, 561 F.2d 494, 503-04 (1977).

22

Flambeau has advanced no credible excuse for its delay in not earlier producing the Ferris letter, which was in existence almost five and one-half years earlier; had been sought in discovery more than two and one-half years earlier; and had been ordered by Judge MacKay to be produced more than nine months earlier. Nor does Flambeau advance any explanation for its General Counsel's false sworn answer to an interrogatory indicating that there had not been earlier gas tank incidents.

Plaintiff's Interrogatory 13 required Flambeau to provide information related to "each lawsuit, claim, *incident, or complaint involving fires/explosions or relating to leakage* associated with plastic fuel tanks or fuel tank assemblies manufactured and/or sold by your company or any of its affiliates." (Emphasis added.) Flambeau's general counsel, laconically responded "No other leakage lawsuits, claims." Defense counsel argued on brief that "Flambeau's response, as written, is true and correct." Def. Br. at 1-2. He might have added misleading. It is plain the answer was facially incomplete and calculated to avoid answering the interrogatory as to either "incidents" or lawsuits or claims "involving fires/explosions" as well as leakage.

Flambeau suggests that the death of Mr. Boccarose is material to its violation of Judge MacKay's February 15, 2002, order. However, it is plain that this untimely event does not excuse Flambeau, its officers, and general counsel from not earlier discovering or producing the Ferris letter in accordance with their discovery obligations or providing false and intentionally insufficient answers to interrogatories or requests for production of documents.

Flambeau's failure to produce the Ferris letter is made more problematic by Flambeau's designation of a Rule 4:5(b)(6) corporate designee to discuss matters pertinent to Flambeau's gas assembly "incidents," quality assurance files, and related information. Defense counsel suggests that no other Flambeau personnel could have provided such information. However, the corporate designee repeatedly testified that he had taken no steps to address the Rule 4:5(b)(6) deposition subjects; that he had exercised no initiative to glean such information from places in which he understood such information might be found, but instead had merely reviewed certain documents produced by others and talked to another witness. Rule 4:5(b)(6), like Rule 30(b)(6) of the Federal Rules, is designed to elicit information from the corporation, not the individual deponent.

> The designated witness is "speaking for the corporation," and this testimony must be distinguished from that of a "mere corporate employee" whose deposition is not considered that of

the corporation and whose presence must be obtained by subpoena. If the persons designated by the corporation do not possess personal knowledge of the matters set out in the deposition notice, the corporation is obligated to prepare the designees so that they may give knowledgeable and binding answers for the corporation. Thus, the duty to present and prepare a Rule 30(b)(6) designee goes beyond matters personally known to that designee or to matters in which that designee was personally involved.

*United States v. Taylor*, 166 F.R.D. 356, 361 (M.D. N.C. 1996); followed by *Black Horse Lane Assoc., L.P. v. Dow Chem. Corp.*, 228 F.3d 275 (3d Cir. 2000). Nor did defense counsel apparently advise plaintiff's counsel before the deposition that no individuals existed who could provide the information sought. Instead, Mr. DeCaro made patently baseless objections to questions of Plaintiff's counsel. Nor is there any indication of attempts to locate other ex-employees who might, in the words of Rule 4:5(b)(6) "consent to testify on its behalf."

Each of Mr. Ruchti's inabilities to respond, as noted *supra*, is a failure to comply with Rule 4:5(b)(6). The matters were noticed for deposition in accordance with the Rule, and therefore Flambeau had a duty to designate a representative with knowledge of each subject. The corporation had a duty to ensure that the designee was prepared to answer questions on each of the subjects noted in accordance with the Rule. It disregarded their duties.

In the aftermath of argument on January 3, defense counsel indicates that Flambeau *now* has seen fit to produce to Martin additional documents, documents that apparently dated to the year 2000. However, while the existence of these documents was apparently disclosed in the November 2002 depositions of Ruchti and Meyer, they were not produced until January 2003.

From all of the circumstances before the Court, including but not limited to the duration of Flambeau's discovery violations; the present proximity of the trial date; Flambeau's own agreement that a violation of Judge MacKay's February 15, 2002, order warranted severe sanctions; Flambeau's subsequent failure to comply timely with this Court's order, especially with regard to matters that go to the heart of a products liability case, Flambeau's continued violations of its discovery obligation pursuant to Rule 4:5(b)(6), I find that Flambeau has either intentionally attempted to obstruct Plaintiff Martin's preparation for trial or has treated its discovery obligations with such careless disregard that its conduct amounts to an intentional attempt to obstruct the Plaintiff's pre-trial discovery. Such flagrant

24

conduct undermining the discovery process requires the imposition of sanctions.[2] I also recognize, however, that entry of a default judgment, as requested by Plaintiff Martin, would decide this case without a trial on the merits. Though Flambeau's violation of this Court's orders especially relate to the central notice issue in this case, I do not find Flambeau's transgressions are so comprehensive that entry of a default judgment is unconditionally warranted.

In accordance with Rule 4:12(b)(2)(C), it is ordered that Flambeau shall be barred from denying notice of any product defects concerning the lawn mower gas tank assembly used by Martin in the September 13, 1998, incident at trial.

---

[2] Although the Court recognizes that Flambeau's failure to abide by its discovery obligation, Rule 4:5(b)(6) may not be the basis for entry of a default judgment, *Brown v. Black, supra,* it confirms Flambeau's reckless disregard of its discovery obligations. Flambeau's discovery failures exceed in duration the discovery failures that have warranted the entry of default judgment by other courts. *See, National Hockey League v. Metro Hockey Club,* 427 U.S. 639, 49 L. Ed. 2d 747, 96 S. Ct. 2778 (1976).