William G. CALLAS and Del S. Callas, Plaintiffs,

v.

TRANE CAC, INC., American Standard, Inc., and The Trane Company, Defendants.

Civ. A. No. 88–0063–C.

United States District Court, W.D. Virginia, Charlotte Division.

Aug. 24, 1990.

**1118**

John McKay, Esq. Richard H. Milnor, Taylor & Zunka, Ltd., Charlottesville, Va., for plaintiffs.

R. Craig Wood, Dayna B. Matthew, McGuire, Woods, Battle & Boothe, Charlottesville, Va., for defendants.

## MEMORANDUM OPINION

MICHAEL, District Judge.

The plaintiffs, William and Del Callas, brought this products liability action against the defendants ("the manufacturers") to recover for the damages sustained when the heat pump in their mountain resort home failed. The court referred the case to Magistrate B. Waugh Crigler pursuant to 28 U.S.C. § 636(b)(1)(B) for the disposition of certain motions. After a hearing on the motions, the magistrate made findings of fact and conclusions of law and recommended that a jury hear the case solely on the issue of damages.

Since the magistrate filed his report, the parties have submitted the following matters for the court to address: 1) Defendants have objected to the magistrate's findings and recommendations; 2) Plaintiffs have moved to strike the affidavit of an additional witness filed in support of the defendants' objections to the report; and 3) Defendants have moved for an enlargement of the discovery period.

As a preliminary matter, the plaintiffs note that the defendants have failed to follow the procedures of Rule 72(b) and thus the court should not hear their objections. Rule 72(b) requires a party objecting to a magistrate's recommendation to "promptly arrange for the transcription of the record." The defendants have not provided the court with a transcript of the magistrate's hearing. Although Rule 72(b) requires only "evidentiary hearings" to be recorded, it states that "a record may be made of such other proceedings as the magistrate deems necessary." To ensure a thorough, meaningful *de novo* review, the rule expressly requires the objecting party to arrange for transcription of the record. The defendants' failure to comply with the mandate of Rule 72(b), with its entirely appropriate rationale, is a matter of some concern; the court has, however, obtained a copy of the transcript from the plaintiffs and can adequately address the merits of the defendants' objections. Having examined the motions and the record, the court is now ready to rule on the matters before it.

## I. Plaintiffs' Motion to Strike

Rule 72(b) of the Federal Rules of Civil Procedure gives the district court discretion in receiving additional evidence in its *de novo* consideration of a magistrate's report. Because the defendants base much of their objection to the report on the affidavit of Danny Beaver, which they submitted as Exhibit A to their objection, the court must decide whether to accept this new evidence in its review of the recommendations. Consequently, the court will first address the plaintiffs' motion to strike the affidavit.

Danny Beaver, an engineer and a product manager for Trane, was deposed as a fact witness during discovery, and his deposition was before the magistrate during the hearing on the motions for summary judgment. The defendants have now filed the affidavit by Beaver to support their objections to the magistrate's report. The Callases oppose the use of this affidavit because the defendants stated at Beaver's deposition that he would not testify as an expert, Beaver Dep. at 3, and they did not list him in answer to plaintiffs' interrogatory asking which experts would testify. Although the defendants do not designate Beaver as an expert, he does know certain conclusions and makes inferences in the affidavit. In dealing with the question, the court will look to the factual allegations in that affidavit. *See infra* at p. 1120.

■ The defendants' submission of this affidavit also troubles the court because the parties agreed in front of the magistrate that the issues were fully developed and could be decided on the basis of the record at the hearing. Rule 56 of the Federal Rules of Civil Procedure applies when the magistrate conducts a hearing on a motion for summary judgment. Thus, a party may not "hold back" in the proceeding before the magistrate, hoping to submit additional affidavits or exhibits to the district judge in objection to the magistrate's determination. *Health Corporation of America, Inc. v. New Jersey Dental Assoc.*, 77 F.R.D. 488 (D.N.J.1978).

Although the court has the discretion to accept this affidavit in its *de novo* review,

the manufacturers have offered the evidence much too late. Indeed, though it does not share the plaintiffs' belief that the affidavit was filed in bad faith, the court is concerned that the defendants did not bring this information forward at an earlier, appropriate time. They have put forward no reason why the information in the affidavit was not given during Beaver's deposition or was unavailable prior to the magistrate's hearing. If the defendants wanted to rely on Beaver's affidavit, they should have put it into the record before the magistrate. Beaver was defendant Trane's employee and, as shown in his deposition, involved in the case over a substantial period of time; therefore, the defendants could have, and should have, offered this evidence much sooner.

■ Even if the court accepted the affidavit, the document does not demonstrate the reliability it seeks to invoke. Beaver, who has not been offered as or proven to be an expert witness, is attempting to submit expert testimony. Even if he were qualified as an expert, no facts in the affidavit or the record support his inferences and conclusory statements and thus his opinion does not meet the standards defined by the Federal Rules of Evidence.

Through Beaver's affidavit, the defendants propose evidence as to the ultimate issue for the trier of fact—what caused the heat pump to fail. It is curious to the court that during his deposition, Beaver did not mention the possibility that the wiring could have been altered, yet this is the primary contention he makes in the affidavit. These technical assertions about the failure of the Callases' heat pump are unfounded. Beaver does not document his factual statements or explain how he made his conclusion about the wiring. For example, Beaver claims that the wiring appears to have been altered, but he does not ascertain that the wiring was proper when it left the factory, nor does he evidence that the wiring had not been altered after it was retrieved from the Callases' home and before the pictures were taken. That Beaver bases some of his remarks on hearsay and does not support the accuracy of his conclu-

sions is not surprising. Beaver never personally inspected the Callases' unit despite having had access to it during the months it was in Mr. Fitch's possession. Although he relies on photographs of the Callases' heat pump to support his conclusions, Beaver does not give any information authenticating the photographs, such as when or where they were taken, or other information indicating that the photographs would be admissible under the Federal Rules of Evidence.

The court also questions the reliability of the affidavit because it contains statements which are inconsistent with Beaver's previous deposition testimony. For example, Beaver states in the affidavit that "the warning issued ... in 'Technical Service Bulletin 85–5' ["TSB 85–5"] was reasonably calculated to inform users of the possible problem presented by this product...." Beaver Affidavit at *paragraph* 7. During his deposition, however, Beaver indicated that he was not aware of any steps that Trane took to warn the heat pump owners of the problem involving switchover valve coil leads, which TSB 85–5 addressed. Beaver Dep. at 61. He further testified that neither TBS 85–5 nor any other communication from the manufacturer instructed the distributors to go out in the field and correct those problems. Id. at 59. In addition, Beaver asserts in the affidavit that TBS 85–5 "was a method selected by the defendant in view of the historic reliability of similar precautions taken to prevent physical harm." Beaver Affidavit at *paragraph* 7. In direct contradiction to this, he stated in his deposition that he was unfamiliar with the process by which the defendants warned consumers or servicemen about possible product defects. He also did not know who received the technical bulletins, Beaver Dep. at 52, or if Trane provided TBS 85–5 or the information it contained to any of the company's representatives or independent distributors in the Charlottesville area. Id. at 60.

Paragraph six of the affidavit states that TSB 85–5 warned of the possibility that switchover valve leads might come in contact with any sheet metal for the "sole purpose of exercising extra caution and assisting field representatives and technicians in 'troubleshooting' during service calls." Beaver Affidavit at *paragraph* 6. This assertion does not negate the fact that the manufacturers were aware—enough so that they issued a warning—of the potential problem which the Callases claim caused the failure of their heat pump. Beaver's claim that the defendants had never observed such a defect is not dispositive of the fact that no such defect existed. These assertions which Beaver makes as to why TSB 85–5 was published and what the defendants observed are curious as Beaver admitted in his deposition that he "never participate[s] in the publication of ... these bulletins." Beaver Dep. at 34.

Finally, the affidavit poses significant concern to the court because it contradicts the deposition testimony of defendants' expert, Mr. Fitch. Mr. Fitch had inspected the unit at least three times and had it in his office for two months. He testified that the failure resulted from ice accumulation on the fan blades, which caused the unit to be off balance and shake until the copper refrigerant lines broke and the electrical control wiring shorted out, rendering the whole heating system inoperable. Fitch Dep. at 3–4. Fitch testified that the Callases' unit "was looked at in pretty good detail" because "it was necessary to go into quite a bit of detail on this thing," Id. at 14, and that he had every fact necessary to reach a conclusion as to why the heat pump failed. Id. at 36. Even though Fitch had carefully examined the unit, as Beaver did not, he made no finding consistent with Beaver's statement that the wiring configuration of the heat pump appeared to have been altered after leaving the defendant's factory. In fact, Fitch stated that he had no knowledge of anyone altering the factory wiring leading to the switchover valve. Id. at 46.

Beaver's affidavit is simply not properly factually based to be a sufficient reason for rejecting the magistrate's report. The court grants the plaintiffs' motion to strike the affidavit.

## II. Defendants' Objections to the Magistrate's Report

The defendants have a number of objections to the magistrate's report. These objections rely in large part on the affidavit of Danny Beaver. As this court has, in its discretion, refused to accept the affidavit, the defendants have little upon which to base their arguments; however, the court has considered and will address the objections.

### A. The recommendation to grant plaintiffs' motion for summary judgment

The defendants maintain that the magistrate relied on erroneous findings of fact and conclusions of law to determine that summary judgment for the plaintiffs was appropriate. They assert that summary judgment is improper because issues of material fact are in dispute, namely, the issues of negligent design and manufacture, the reasonableness of the warning, contributory negligence and proximate cause. The manufacturers claim that these issues involve factual disputes about reasonableness and causation and are thus jury questions.

### 1. The findings of fact on the issues of defective design and inadequate warning

■ To refute the magistrate's finding that the heat pump was defective, defendants refer to evidence with which they intend to show that the pump's wiring was re-routed after it left the factory. This evidence, however, appears for the first time in Beaver's affidavit. The record at the time of the hearing did not indicate that the unit's wiring could have been altered after it left the manufacturer. As previously noted, the defendants' expert had possession of the failed heat pump for two months, until he discarded it. They thus had ample opportunity to demonstrate wiring defects before the end of discovery and the summary judgment hearing.

On the issue of defective design and/or manufacture, the defendants' strenuously oppose any conclusion that the Callases' unit was negligently made based on the publication of TBS 85–5. As the court noted above, the manufacturers were obviously aware of a wiring problem or they would not have mentioned it in the bulletin. In addition, other portions of the record support the magistrate's finding of negligence, particularly the depositions of Fitch, Beaver and Shear, who all testified that TSB 85–5 gave notice of a wiring defect in the plaintiffs' unit, and the deposition of the plaintiffs' expert LaMotte.

The manufacturers' objections to the findings of fact regarding the warning issue are in a similar vein. Citing Beaver's affidavit, they refer to how the "evidence will show" that their warning was reasonable. Despite the fact that the defendants stood before the magistrate, with evidence as to the warnings' adequacy in the record, and submitted that the motions be decided on the basis of that record, they now propose that they should be able to rely on information which they had not brought forward during discovery or before the magistrate. The manufacturers give no reason whatsoever why they could not have submitted the evidence upon which they now seek to rely before the hearing.

Without Danny Beaver's affidavit, the record does not support the defendant's objections to the factual findings of negligence. Because they are consistent with the evidence, the court adopts the magistrate's findings of fact as to the defective design and warning issues.

### 2. The findings of fact and conclusions of law as to contributory negligence

■ Having found against the defendants on the issues of negligent design and failure to warn, the magistrate addressed the issue of causation. At the hearing, the manufacturers had the burden to prove contributory negligence. Relying on the discovery—mainly depositions—that had been filed, the defendants did not offer additional affidavits or other evidence with which they could prevail at trial. The court has examined the evidence before the magistrate and finds that he was correct in his assessment of contributory negligence.

The manufacturers assert that because the material issue of contributory negligence is disputed in the record, summary judgment cannot lie. The parties do indeed dispute whether the Callases were contributorily negligent. However, the factual issue of negligence cannot get to a jury without first finding a legal standard by which to measure the allegedly negligent acts. The defendants have given no such legal standard except their explication of "reasonable care." The magistrate found that, as a matter of law, the Callases were not negligent because the defendants had offered no standard of reasonable care by which the plaintiffs could have prevented the accident.

The manufacturers argue, as they did before the magistrate, that if the Callases "had made some arrangements" for the home, instead of leaving it for an extended period of time, they could have prevented the heat pump from failing. The crux of their position is this: Even though the unit would have failed anyway, ice on the fan blades caused excessive vibrations which hastened the unit's failure; had the plaintiffs been home, they would have noticed the vibrations and prevented the accident. The defendants offer no evidence, however, by which the court or a jury could compare the reasonableness of the plaintiffs' actions. The court acknowledges that the Callases had a duty to use "reasonable care," but unless the defendants can link that duty to specific actions by which a fact finder can compare what is reasonable in such a situation, the standard is meaningless. "Reasonable care" does not exist in a vacuum. Indeed, in a critical admission, the defendants' expert witness could not identify what a "reasonable heat pump owner" would do to avoid such an accident. He admitted that an owner could do nothing to prevent ice accumulation on the blades, that he knew no one who checked for ice accumulation, that no owners manual alerted owners to the potential of ice accumulation, and that service manuals do not address the problem. Though he did mention some possible precautions, such as putting anti-freeze in pipes and turning off the water, it is patent that homeowners rely on central heating to avoid having to take such extreme measures.

Moreover, to allow defendants to explore such a nebulous standard of care at trial would defeat the purpose of product liability jurisprudence. Even if the Callases had a duty, for example, to have a caretaker visit the home every day or two, what then would be the caretaker's duty of care? Would he have to check the heat pump every day? Or every other day? Allowing such an inquiry could lead to an eventual distortion of manufacturer's liability. The defendants simply have no evidence that defines the standard of care to which they propose to hold the Callases accountable and thus summary judgment must lie for the plaintiffs on this issue.

The manufacturers contend that the magistrate incorrectly limited the scope of possible contributory negligence to that which caused the accident, when in fact the plaintiffs could also be contributorily negligent by failing to exercise ordinary care to prevent the damage incurred as a result of the accident. *See Von Ray v. Whitescarver* 197 Va, 384, 89 S.E.2d 346 (1955) (contributory negligence includes an "act or omission which ... fails to prevent the injury."). This assertion does not take them far, however, given the grounds for the finding that the Callases were not contributorily negligent in causing the accident. Just as the record gives no indication of the reasonable care necessary to avoid the accident, it evidences no standard of care by which the Callases could have prevented the injury they suffered. Indeed, it is doubtful that the defendants could offer any standard to which a fact finder would give credence. The Callases could not have prevented injury from the unexpected failure of the heat pump except by clearing their home of any property which could be damaged. The court cannot seriously believe that the manufacturer would seek to impose such a standard.

The defendants basically ask the court, as they would a jury, to accept the proposition that, even though the plaintiffs bought a heating unit which, among other things, was to maintain heat and prevent pipes

from freezing in plaintiffs' absence, they should nonetheless still undertake to meet a substantially unarticulated standard of reasonable care which would require them to anticipate and prepare for the failure of their new heating system. The court cannot accept the defendants' position and agrees with the magistrate's conclusions about the use of a contributory negligence defense.

### 3. The findings of fact and conclusions of law as to proximate cause.

■ Having found that contributory negligence does not bar their recovery, the court need not address whether the Callases actions proximately caused the injury; however, because the magistrate made findings on that issue to which the defendants object, the court will review them.

The manufacturers assert that the Callases' acts proximately caused their injury, defining proximate cause as "a direct, efficient contributing cause of the accident." Even if, arguably, the plaintiffs did act negligently, the defendants still fall short of proving contributory negligence because they have not established the necessary causation. The magistrate correctly decided that the Callases' absence from the home and failure to take further precautions were not efficient contributing causes of the accident. If it is assumed that ice on the fan blades would cause vibrations, nothing in the record indicates the level of noise of such assumed vibrations, or that such vibrations would have been loud enough, or extended enough over a sufficient period of time for either the plaintiffs or a caretaker to notice. The record provides no basis for a finding that the plaintiffs' actions proximately caused the accident or their injury. The magistrate appropriately granted the Callases' motion for summary judgment on the defense of contributory negligence.

### B. The magistrate's recommendation to exclude expert testimony

■ The court notes that it reviewed the foregoing objections to the magistrate's report in light of the evidence which the magistrate considered, including the expert testimony of Mr. Fitch. Thus, allowing his testimony would not affect the summary judgment rulings made thus far. Even though this court's adoption of the magistrate's recommendation to grant summary judgment on the negligence and contributory negligence issues renders the motion to exclude Fitch's testimony moot, the court will address the finding because of the defendants' specific objection to it.

The defendants base their assertion that the testimony of Mr. Fitch is admissible on Rules 702 and 703 of the Federal Rules of Evidence. They object to the magistrate's determination that Mr. Fitch based his conclusions about the heat pump on speculation, asserting instead that Fitch testified about the probability of ice buildup on the fan blades and the similar failure of other heat pumps "based on facts and data from which he has made reasonable inferences." The manufacturers' point is that the weight of Fitch's testimony is at issue, not its admissibility.

The plaintiffs rebut the objection on the grounds that Fitch made only a perfunctory examination of the heat pump and that he did not analyze other possible factors besides ice buildup. They claim that Fitch grouped this heat pump with others that had ice damage despite the fact that someone had seen ice on all the other units, and no one viewed ice on the Callases's unit.

Assuming for the sake of argument that Fitch is appropriately qualified as an expert, the court agrees with the magistrate's finding that no facts in the record adequately support Fitch's opinion that ice on the fan blades caused the unit's failure. The court concludes, as a matter of law, that the basic fact testimony in the record is not an adequate predicate for Mr. Fitch's conclusions. The facts in the record speak for themselves: Fitch never visited the site of the accident; he does not know the weather conditions on the day in question; even if he knew the weather conditions, he does not know for a fact that ice accumulated on the blades; and assuming ice did form, he cannot ascertain that it formed in such a way as to cause an imbalance.

Because the Federal Rules of Evidence require that an expert base his opinion upon concrete facts, and because the underlying facts upon which Fitch's opinion rely are not substantial enough as a matter of law to justify his conclusions, the court adopts the magistrate's recommendation and grants the plaintiffs' motion to exclude the testimony of Mr. Fitch.

### III. Defendant's Motion to Extend Discovery

The manufacturers claim that additional discovery is necessary to investigate an alternative, unpleaded theory of defense. The court's adoption of the magistrate's recommendation to grant summary judgment on the issues of negligence and contributory negligence leaves only the issue of damages, and thus further theories of defense are of no avail to the defendants.

■ Even if the issue of the defendant's negligence were to go forward, the court believes that their request for more time to develop their case comes too late. The parties agreed to have the case decided on the facts before the magistrate at the time of the summary judgment hearing, after having over two years to develop their cases. The manufacturers have given no good reason why the court should indulge them with more time, especially as they had access to the failed unit for a reasonable period, i.e., at least two months, while the unit was in Mr. Fitch's possession. The defendants' motion to extend discovery is denied.

### IV. Conclusion

For the foregoing reasons, the court adopts the report and recommendations of the magistrate and denies the defendants' motion to dismiss or for summary judgment, grants summary judgment to the plaintiffs on Counts I and II of the amended complaint and on the issue of contributory negligence, grants the plaintiff's motion to exclude Mr. Fitch's testimony. The court further denies the defendants' motion to enlarge discovery. A jury shall hear the remaining issue of damages.

### REPORT AND RECOMMENDATION

B. WAUGH CRIGLER, United States Magistrate Judge.

This diversity action has been brought by citizens of Maryland who had purchased a house in Wintergreen, Virginia, that was equipped with a GE Weathertron heat pump manufactured by the defendants. The residence, which was a vacation home, was not occupied during the months of December, 1985 through February 6, 1986, but the thermostat for the heating system had been set between 63 degrees and 65 degrees. During the period between January 9, 1986 and January 18, 1986, there was a complete failure of the heating system, both heat pump and supplemental heating, as a result of which the plumbing froze in the residence, which plumbing eventually burst thereby causing substantial damage to the interior of the structure.

Plaintiffs instituted this action against the manufacturers of the heating system seeking compensatory damages for the losses they sustained. The case has been referred to this court pursuant to 28 U.S.C. § 636(b)(1)(B) to conduct proceedings and to render a report to the presiding District Judge setting forth findings, conclusions and recommendations for the disposition of certain dispositive and non-dispositive motions filed by both sides. Defendants, by counsel, have moved to dismiss and/or for summary judgment as to Count II of plaintiffs' amended complaint which claims a violation of the defendants' duty to warn. Plaintiffs have moved for summary judgment on Count I (negligent manufacture), on Count II (duty to warn) and on the question of damages. By a motion in limine, they further seek to exclude the testimony of defendants' expert, Mr. Fitch, from the trial of the case. Argument on these motions was heard on April 30, 1990, at which time respective counsel ably addressed the issues. In consequence thereof this Report and Recommendation issues.

### I. Defendants' Motion to Dismiss and/or For Summary Judgment

Defendants contend that under the law

of Virginia [1], plaintiffs have failed to state a claim because they have not sufficiently alleged or shown dangerousness, and they have suffered harm only to property which, according to defendants, cannot give rise to a cause of action under Virginia's duty to warn. They further contend that even if there initially was a duty upon defendants to warn, it ceased with the sale of the product. In support of these contentions, defendants refer to the language of the Restatement (Second) of Torts § 388, *Featherall v. Firestone Tire & Rubber Co., et al*, 219 Va. 949, 252 S.E.2d 358 (1979); *City of Richmond v. James*, 170 Va. 553 (1938); and the federal cases of *Bly v. Otis Elevator Co.*, 713 F.2d 1040 (4th Cir 1983); *Large v. Bucyrus–Erie Co.*, 707 F.2d 94 (4th Cir.1983); and *Tyler v. Street & Co.*, 322 F.Supp. 541 (E.D.Va. 1971).

Plaintiffs respond by first arguing that the Virginia Supreme Court, in Featherall, clearly adopted § 388 of the Reinstatement in its entirety. They suggest that what escapes defendants' notice is that if § 388 was so adopted, both the applicable definition contained elsewhere in the Restatement, as well as the comments applicable to § 388, also must be accounted for in determining the whether plaintiffs either have stated a claim or have shown sufficient facts to withstand defendants' motions. Specifically, plaintiffs rely on § 7 of the Restatement for the definitions of "injury", "harm" and "physical harm" in support of their claim for recovery of consequential damages occasioned by their property loss. They contend that the amended complaint is replete with allegations revealing the dangerousness of the alleged defective product (here a heat pump) to the real and personal property that was damaged when the product failed. Moreover, relying on the precise language of *Featherall*, plaintiffs point to the evidence of defendants' own employees to show that the defendants not only should have known of the defect and the resultant damage that this very failure might cause, but that defendants did know of it in advance of the

time plaintiffs' unit failed, yet they took no steps to warn those who reasonably would be expected to be injured thereby of the potential harm or (alternatively, to advise them that the defect could be remedied in advance of failure. *Featherall*, they contend, places the duty to warn on the one who has the superior knowledge of the product, here the defendants, and it extends the protections of the duty to anyone, including the plaintiffs, who "might in the ordinary and natural course of events be subjected to danger." *Featherall* 219 Va. at 963, 252 S.E.2d 358.

It is the opinion of the court that defendants misconstrue both § 388 and *Featherall*, whereas plaintiffs' interpretation thereof is correct. In addition, defendants' argument that there is no post-sale duty to warn, and their reliance on the statute of limitations cases in support of such defense, misses the mark. *See, Bly v. Otis Elevator Co.*, 713 F.2d 1040, 1045–56 (4th Cir.1983), distinguishing claims based on negligent failure to warn from those sounding in strict tort where the failure to warn renders the product unreasonably dangerous. The amended complaint clearly sets forth facts sufficient to support the claim that the defendants had a duty to warn about a defect which was unreasonably dangerous to property in this specific case, that they failed to do so and that, as a consequence, plaintiffs suffered physical harm to their property. The facts developed during the discovery phase of the case do not belie these allegations, and will be addressed in more detail when the court considers plaintiffs' motion for summary judgment. Therefore, it is

### RECOMMENDED

that defendants' motion to dismiss or for summary judgment as to Count II (duty to warn) of the amended complaint be denied.

## II. Plaintiffs' Dispositive and Non-dispositive Motions
### A. OVERVIEW

Plaintiffs have raised several issues in their motions for summary judgment and

---

**1.** This is a diversity case, which requires the application of Virginia law to the substantive issues under the principles announced in *Erie*

*Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

in their motion to exclude the testimony of defendants' expert witness. Before addressing them, the court points out that it would be easy to confuse the issues that are raised by these separate motions. One easily could be tempted to lump all of them into the consideration of whether the defendants' expert should be allowed to testify under the circumstances of this case. However, the court believes that to do so would obscure the true issues before the court, keeping in mind that the pertinent discovery in the case is complete. Based on the arguments of counsel, it clearly appears that neither side can offer more evidence than that which has been brought out in the discovery record. Therefore, to the extent possible, the court first will address those questions not dependent upon whether the expert testifies, and then it will turn to those questions dependent upon a resolution of the issues related to whether he should be permitted to testify. Both sides seem to recognize that if the defendants' expert cannot testify, plaintiffs would be entitled to summary judgment.

## B. PERTINENT EVIDENCE

There is no dispute in the evidence that defendants manufactured a product that possessed a manufacturing defect. Trane's own technical service bulletin, TSB 85–5, reveals that certain wires to the Alco switchover valve were not properly positioned, or routed, so as to avoid contact with nearby sheet metal or other abrasive components of the unit. As a result, the wires were susceptible to chafing, which, in turn, was likely to cause a short that would blow the low voltage fuse. Once the low voltage fuse was tripped, no power would be supplied to the system, and it would not function.

Defendants' Rule 30(b)(6) designee, Roy Shear, conceded that unless there had been a change in the wiring configuration during service (use), of which there was no evidence in the instant case, the wiring would have retained its initial manufacturing

routing, which was the subject of the TSB 85–5. (Shear Deposition, at 52–54). This service bulletin recognizes the error in the initial routing configuration and alerts the reader to the potential of an electrical short. If this were to occur, thus causing the low voltage fuse to blow out, then regardless of whether the system had auxiliary emergency heat, no heat would enter the residence[2]. (Id. at 64). In other words, the entire system would be in a state of failure, and freezing of pipes could then be expected, of course, depending on the climatic conditions. (Id.).

Shear also stated that the manufacturing defect was something that the ordinary consumer would not be expected to discover prior failure. (Id. at 65). The unit would have to be "taken apart" in order to visualize whether the chafing discussed in the TSB existed. Furthermore, Shear acknowledged that the defendants never warned consumers, including the plaintiffs, of the defect, and that the only warning issued was TSB 85–5, which was directed only to distributors, dealers, service technicians and the like. (Id. at 68). Nor did the TSB act as a recall of the units; the terms of the TSB allow for repair of installed units only upon a service call once the unit had failed or had become problematic.

Plaintiffs' expert, Ross LaMotte, testified that the freeze-up in the plaintiffs' home occurred when the system failed to engage the emergency heat because the low voltage fuse had blown as the result of abraded and shorted wires. (LaMotte Deposition, at 13, 18, 83). Consistent with defendants' corporate designee, LaMotte related that when the low voltage fuse is inoperable, all the controls become inoperable just as if there was no power running to the system in the first instance. (Id. at 83).

LaMotte did find physical damage to the exterior unit's components, and these findings were the subject of considerable examination during the deposition. Principally, LaMotte found the refrigerant coils to be

---

**2.** The court here distinguishes between auxiliary heat that is supplemental to and whose circuitry is integrated with the heat pump, on the one hand and independent heating unconnected with the heat pump's circuitry, on the other. It is the former that exists in the case at bar.

ruptured and discovered evidence that the compressor had been "banging against the internal case". (*Id.* at 22). This was caused either by soft springs on the compressor or "slugging", a condition produced when too much refrigerant enters the compressor. (*Id.*). However, plaintiff's expert discovered no mechanical failure in the compressor itself upon his inspection of the unit. (*Id.* at 19, 22, 45).

Nevertheless, it was LaMotte's belief that wire abrasion would have occurred because of routing during manufacture, the subject of TSB 85–5, irrespective of whether the unit vibrated normally or abnormally while in service. (*Id.* at 82). Abnormal vibration only would have had the effect of hastening rather than initially causing the failure. LaMotte further opined that the failure to route or otherwise protect the wire leads violated principles of "good engineering" design which would require protection of the wiring or proper distancing thereof from sharp edges or abrading surfaces. (*Id.* at 51, 71–72).

Defendants' expert, John Fitch, conceded that the chafed and shorted wires rendered the supplemental heating system inoperative, and that such was a cause of the loss of electrical power to the supplemental heat source. (Fitch Deposition, at 28–29). He also agreed that a malfunction of the compressor or a break in the coil would not "directly affect the supplemental heating source." (*Id.* at 28). In essence, Fitch never contested, rather he confirmed, the presence of conditions that the defendants' corporate designee and plaintiff's expert identified as the manufacturing defects. He also conceded that in the instant unit he found chafed wires leading to the Alco switch-over valve, that these leads were shorted out and that short-circuiting of the wiring would "in fact create a malfunction which would then render the supplemental heat source inoperative". (*Id.* at 28).

However, it was Fitch's view that the short circuit in the wiring resulted from a failure of the exterior unit when ice accumulated on the fan and, in turn, caused the unit to shake, thus abrading the wiring. (*Id.* at 3–4). Fitch appears to have reached this conclusion from his examination of the unit after it was removed from the failure site and rests on the following factors: a) the home was unattended at the time of failure; b) the unit's heat pump mechanism had suffered visible damage, particularly ruptured refrigerant lines; c) there was ice build-up on the fan blades that caused the fan to become unbalanced, thus causing the unit to shake, wobble, flex and eventually break. (*Id.* at 26–28).

Of the factors stated, only one of them came from Fitch's inspection of the unit, i.e. the broken components. Fitch reached his conclusions about ice accumulation without knowing whether, in fact, ice had built up on the blades either before or after the failure, but by assuming that such existed before the failure. He justified this assumption by calling on his experience with several other failed units he had examined where it was known at the time that ice had accumulated on the blades in sufficient amounts to cause a malfunction in the exterior unit itself.

Interestingly, there is nothing in his testimony that would reveal that the sample failures, comparators if you will, ever involved a failure of the back-up or supplementary heat system, as was the case at bar, or that the failures occurred under substantially similar factual circumstances. In fact, Fitch had no knowledge about any of the events leading to the failure of the outside unit, nor could he sequence such. Furthermore, Fitch could not relate the date on which the failure occurred, and he could not testify as to the weather conditions on the date that the unit in question failed. The most he could say was that the failure occurred during a period of inclement weather in the geographical area; that he had seen other units fail because of an accumulation of ice on the fan blades; that the plaintiffs were not home during the relevant time; that he believed ice had formed on the blades though he could not confirm or dispute such; and that if the plaintiffs had been at home at the time they would have noticed the problems before the problems resulted in a complete freezing of their plumbing and the consequential damage to their dwelling.

Remarkably, Fitch further testified that there was very little a homeowner could have been expected to do in order to prevent ice accumulation on the fan blades short of covering or tenting the unit every time it precipitated. (*Id.* at 60–61). Counsel for defendants has conceded that the manufacturer provided no materials with the sale of the unit to construct such device. In addition, Fitch confessed that such a preventative practice does not exist in the area where the failure occurred, nor is there anything in the manufacturer's literature that would suggest an owner needed to take such prophylactic steps to avoid damage. (*Id.* at 61) The one preventative measure suggested by the manufacturer's literature, i.e. sweeping snow from around the base of the unit, would have played no role in avoiding the instant failure. (*Id.* at 61–62).

Plaintiffs testified that they purchased the home in Wintergreen in August 1985, and that the heating system was newly installed and operational at the time of purchase. (William Callas Deposition, at 104–105). All manufacturer's literature that was left by the builder had been retained and any instructions therein were followed. (*Id.* at 108–109). Plaintiffs were not aware of any warning, if there was any in fact, which had placed on the heat pump unit itself. (*Id.* at 112). No such warning has been shown by any other evidence. The exterior unit was surrounded by a fence and was never inspected by plaintiffs prior to its failure. (*Id.* at 112, 114).

The home at Wintergreen was purchased as a year-round vacation home and was never offered for rental use. (*Id.* at 118). No caretaker was engaged to oversee the premises during plaintiffs' absences. (*Id.*) Plaintiffs occupied the residence several times between September and mid-December 1985, but from then until the plaintiffs became aware of the subject damage to their residence, they were absent from it. (*Id.* at 121). To the plaintiffs' knowledge, the heat pump was operational during the period prior to its failure and no problems with the system were discerned prior to their leaving in December 1985. (*Id.* at 123).

Before leaving in December, 1985, plaintiffs secured the residence from intruders and set the thermostat between 63 and 65 degrees. The plumbing in the residence was not drained, and it was revealed to plaintiffs after the subject event that the water supply to the dwelling could be cut-off only at the "highway." (*Id.* at 124–125). Plaintiffs learned of the subject events when notified by a furniture delivery person that there was water damage in the home. (*Id.* at 127–128). All events that transpired thereafter related to plaintiffs response to the damage incurred.

The other evidence relevant to plaintiffs' motions deals with damages. Suffice it to say that, at this juncture, defendants have not produced any evidence countervailing that of the plaintiffs with respect to the amount of loss plaintiffs claim to have suffered as a result of the failure of the heating system. To that extent the sum is fixed. Nevertheless, the claim remains one for unliquidated damages.

## C. NEGLIGENT MANUFACTURE AND/OR DESIGN; NEGLIGENT FAILURE TO WARN; CONTRIBUTORY NEGLIGENCE

Plaintiffs are seeking an award of summary judgment on Counts I and II of the amended complaint on the grounds that there are no genuine issues of material fact. In large measure, that is true, particularly since none of the witnesses, either expert or lay, challenge or otherwise put into issue the facts that the unit was made and delivered in a defective condition, that the defendants failed to properly route the leads to the switching valve, that such failures violated good engineering practices for design and manufacture and that defendants failed to warn the user of the defect in breach of their duties under the Restatement (Second) of Torts §§ 388, 395, and 398. In this court's view, there are no genuine issues of fact as to whether defendants were negligent in their design and/or manufacture of the unit in question, or as to whether they negligently failed to warn the user of the defect. Plaintiffs should be

entitled to partial summary judgment on those issues thus entitling them, at least, to a partial directed verdict and jury instruction in these respects. The only issue of liability over which there may be a dispute in the material facts is that of causation. Thus, the court turns to examine that issue.

Both plaintiffs' and defendants' experts agree that the last event precipitating the freeze in the plaintiffs' dwelling was a short circuit in the wiring leads to the switchover valve which, in turn, blew the low voltage fuse. Plaintiffs' expert says that such was the sole proximate cause, believing that it would have occurred irrespective of whether the vibrations that abraded the wiring were normal or abnormal and inferring that the manufacturer should have anticipated either type of vibration when it designed the routing pattern for the wiring and placed the wires in their position without proper protection. Counsel for defendants argue, on the other hand, that their expert believes that while the wiring/short scenario was the last cause in time, it was not the sole proximate cause. They say Fitch believes that in-service conditions contributed to the cause of the failure, conditions the defendants contend, at the least, are not their responsibility and, in a light most favorable to them, are the result of the plaintiffs' negligence. Therefore, the court must address both the questions of intervening cause and contributory cause.

It is axiomatic Virginia law, and the jury would be told, that a proximate cause of an event is the cause "without which" the event would not have occurred. *Virginia Model Jury Instructions, Civil,* (cited hereafter as *Model Instructions*), Instr. No. 5.000; *Banks v. City of Richmond,* 232 Va. 130, 348 S.E.2d 280 (1986); *Coleman v. Blankenship Oil Corp.,* 221 Va. 124, 267 S.E.2d 143 (1980); *Beale v. Jones,* 210 Va. 519, 171 S.E.2d 851 (1970). As the comments to the Model Instructions clearly indicate, so long as the defendants' negligent act is "a" proximate cause of the event or injury, there is liability, unless there is contributory negligence on the part of the plaintiff, in which event a question

of "the" proximate cause must be resolved. Clearly, none of the evidence here puts in dispute that the manufacturing defect was "a" cause of the event that damaged plaintiffs' property. However, defendants have raised the defense of contributory negligence in the case at bar. Therefore, unless the defendants can prove that the plaintiffs were contributorily negligent, and that such proximately contributed to the event, plaintiffs are entitled to summary judgment on liability, as the defendants' own expert, even if permitted to testify, cannot not controvert that the failure of the wire leads was the precipitating cause of the system's failure.

In coming to grips with the defenses asserted in this case, it is important to examine what defendants really seem to be suggesting. They, in part, are attempting to lay the blame on other causes, all involving failure of the mechanical components of their product, which components are not alleged to have been negligently designed or manufactured. Superimposed on this is their claim that plaintiffs were negligent and that such was a cause of the eventual failure. The defense of contributory negligence aside, the defendants would not be able to set up other causes of the system's failure as a defense to the claims unless they also could show the such constituted an intervening cause under Virginia law. While such determination ordinarily is one for the jury, defendants must establish facts that go beyond conjecture, speculation and surmise and, instead, amount to genuine reasonable inferences before the issue may be submitted to the jury. *Beale,* 210 Va. at 522, 171 S.E.2d 851; *see also, Spence v. American Oil Co.,* 171 Va. 62, 68–69, 197 S.E. 468 (1938).

To show an intervening cause, defendants' evidence must establish that such cause entirely superseded the negligence of the defendants, and that it, without the defendants' negligence, produced the event or damage. *Coleman v. Blankenship Oil Corp., supra,* 221 Va. at 131, 267 S.E.2d 143. On the evidence now before the court, defendants fail to establish that their negligence was superseded by any other

event so as to call into play the theory of intervening cause in avoidance of liability. Such a "straw man" defense could not survive plaintiffs' motion for summary judgment under Virginia law. However, because Virginia holds true to the doctrine that contributory negligence completely bars recovery where such is shown to contribute to the event, the court's inquiry does not end here. *See, e.g., Scott v. Simms,* 188 Va. 808, 51 S.E.2d 250 (1949), *Yeary v. Holbrook,* 171 Va. 266, 198 S.E. 441 (1938).

Contributory negligence is defined as the failure to act as the reasonable person would have acted under the circumstances of the case. *Model Instructions,* Instr. No. 6.00, citations omitted. Before the defense can be complete, however, defendants also must show a causal connection between a plaintiff's violation of that duty and the event or damage. Plaintiff's negligence, if any, must be more than just a remote cause which may have antecedently contributed to the event or damage. 13B *Mich.Jur.,* Negligence, § 21. Negligence without causation is not sufficient, and it is axiomatic that on these issues, the defendants have the burden to produce evidence from which reasonable inferences, as opposed to speculation and conjecture, provide genuine issues of material facts for the trier of fact. *Celotex v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must ascertain the standard against which plaintiffs' conduct is to be measured for purposes of ascertaining whether their duty has been met and then examine the evidence to determine whether there are genuine issues of material fact that any violation of the standard proximately contributed to the event or damage. Distilled, it becomes a matter of reasonable expectations.

At the heart of Fitch's testimony is the underlying fact that plaintiffs were not on the premises at the time of the failure. He did not know how long they had been away (Fitch Deposition at 57), though the other evidence does establish these facts, and to reiterate, he was not in a position to testify what the conditions were on the scene at the time of failure. Instead, he was required to make certain assumptions in reaching his conclusions. Those assumptions, in large part, were based on other situations he had experienced, the underlying circumstances of which he could not say were substantially similar to the case at bar. Equally important to his formula was his belief that ice had accumulated on the fan blades.

By the same token, Fitch confirmed that plaintiffs would not have been put on notice by the defendants product literature of the steps he personally felt should have been taken to avoid this icing condition, if icing existed at all, and he confessed that there was nothing the owners could have done to have prevented the icing. (See, e.g. Fitch Deposition at 60). Furthermore, the defendants either through this or any other witness, do not offer any evidence of misuse or unintended use of the product. Instead, through Fitch, the defendants offer that plaintiffs should have been sufficiently educated consumers to have foreseen the very kinds of problems Fitch believed to have occurred with this unit. Furthermore, because Fitch believed that power failures were common in that locale, he opined that plaintiffs should have established a contingency plan for such power failures by installing a separate supplemental heating system. Even so, Fitch was not in a position to testify whether plaintiffs did or did not have a power failure plan in place, and he offered no evidence concerning whether the separate supplemental heating he recommended would have been any less free from general power outages than the system installed in the first place. In addition, neither Fitch nor counsel for defendants could identify any standard that would have required the plaintiffs to have taken the action Fitch recommended, by and large rendering his evidence in this regard personal lay opinions on these subjects.

The question that arises out of all this is one that is not foreign to Virginia courts. It ultimately asks whether the plaintiffs' conduct had anything to do with the failure of the supplemental heating system that under the law has been shown to have led

to the freeze-up in plaintiffs' home. It is this court's view that just as the plaintiff's conduct in *Chereskin v. Turkoglu*, 235 Va. 448, 369 S.E.2d 161 (1988), had nothing to do with his being struck by the defendant's car, except that he was present at the scene of the accident, plaintiffs' absence from the residence had nothing to do with the failure of the wiring on the instant unit. Defendants' contention here that plaintiffs were contributorily negligent because they were not home to prevent the occurrence, or that they should not have reasonably relied on the heating system purchased from defendants but instead should have expended further sums for a back-up system which their expert did not show was any less likely to avoid even simple power failures or that they should have hired caretakers to oversee, among other things, the operation of the heating system flies in the face of all reasonable expectations generated by defendants consumer material in the first place and human experience in the second. This court does not believe that the homeowner has a duty to be confined to quarters, so to speak, just so he/she could be around to prevent a failure in a product which was negligently designed and/or manufactured in the first instance. This is particularly so when, as here, the defect was one not discoverable by the ordinary consumer. This court is not aware of any law that would have required the plaintiffs to have anticipated defendants' negligence or to have taken steps to have prevented the effects of that negligence when there is not one iota of evidence to suggest plaintiffs were alerted to the problems defendants' expert say existed. Virginia law clearly does not require consumers of a product to observe defects that are hidden, obscured or otherwise discoverable only by those trained in the product's functions, nor does it require consumers to become "experts" in the operation of every item purchased for their protection, use and enjoyment. Cf., *White Consolidated Industries, Inc. v. Swiney,*

237 Va. 23, 30, 376 S.E.2d 283 (1989). In large measure, defendants' theory runs counter to common experience. It is analogous to a mirage. The closer one gets, the more it disappears. If permitted to be successfully advanced here, the theory would defeat the purpose of Virginia law which places the responsibility on the manufacturer to produce a carefully made product and to warn when it has failed to do so. Looking at it from another perspective, just as a manufacturer is not the insurer of a product, a home owner is not the insurer against loss attributable to manufacturer negligence.[3] In the court's view, if the defense of contributory can proceed to trial under the circumstances presented in this case, manufacturers thereby would be relieved from any responsibility to carefully manufacture products and to warn when they, as in this case, know the product has not been carefully manufactured as The Restatement of Torts and Virginia law require.

For these reasons, and irrespective of whether Fitch is permitted or precluded for offering his evidence, it is

## RECOMMENDED

that plaintiffs' motion for summary judgment on Counts I and II of the amended complaint, and plaintiffs' motion for summary judgment on the defense of contributory negligence be granted.

## D. MOTION TO EXCLUDE TESTIMONY OF DEFENDANTS' EXPERT

At this juncture it is not necessary to cover again the deposition testimony of Fitch, for, should the presiding court adopt the above recommendation, plaintiffs' motion regarding that testimony would be rendered moot. This court, nevertheless, will address the issue so as to leave unresolved none of the matters referred to it by the presiding District Judge.

---

**3.** In oral argument on the motions, counsel for defendants seemed to advance the theory that the owner of the property is the insurer even of a loss occasioned by the negligent manufacture of a product when counsel offered that steps a

reasonable person would take in discharging his/her duty to exercise ordinary care included securing home owners insurance. The court does not believe that Virginia law has gone quite that far.

It is clear law in this Circuit that an expert may give his/her opinion based on hypothetical facts provided those facts are supported by and consistent with the evidence in the case. *Newman v. Hy–Way Heat Systems, Inc.,* 789 F.2d 269, 270 (4th Cir.1986); *Cunningham v. Rendezvous, Inc.,* 699 F.2d 676, 678–79 (4th Cir.1983). The purpose of the rule is to allow opinion evidence to be considered by the trier of fact so long as the facts upon which the opinions are based are not speculation, surmise or conjecture. *Cunningham v. Rendezvous, Inc., supra,* at 678. Practically speaking, every expert will have an opinion, but only those whose opinions are based on the facts of the case, or reasonable inferences therefrom, will be permitted to testify.

It is the view of this court that Fitch's opinions are based on assumptive facts that, in the main, are speculative. He says that the outside unit failed because he believes ice accumulated on the fan blades. However, he was not present at the site either before or after the incident, does not know the weather conditions at the scene on the day of the incident and does not know whether ice, in fact, formed on the blades, as was the case in the units he used as comparators, upon which comparisons he bases his beliefs.[4] That defendants will ask the court to judicially notice the weather conditions during the relevant period would not solve the question of whether ice actually had formed on the blades in a way to cause imbalance before the failure. Even Fitch recognized that conditions could exist where no ice would accumulate or that ice could form uniformly on the blades so no imbalance would result. He also admitted that he did nothing to rule out other causes for the failure before reaching his conclusion on the facts he assumed. At the conclusion of his deposition, Fitch admitted that there was nothing an owner could do to prevent ice from accumulating;

that no one of whom he was aware ever checked for a such condition; that none of the owners manuals would have alerted plaintiffs of such potential; and that even the service manuals do not address the problem. Clearly, nothing of this sort ever was brought to plaintiffs' attention before the event.

It is the view of this court that Fitch's testimony is a glaring example of an opinion based on speculation, surmise and conjecture rather than one premised upon established facts and circumstances and reasonable inferences to be drawn therefrom. The court reaches this conclusion aware of the proclivity of trial courts to permit the trier of facts to sift out what otherwise may be weak, yet admissible, evidence in their deliberative process. By the same token, juries are told that their verdict cannot be based, in whole or in part, upon speculation, surmise or conjecture. Since this court believes that Fitch's evidence falls within that category, the jury would be led to believe from the instant of defendants' opening statement to the concluding instructions of the court that Fitch's evidence was of the type and quality they should consider and upon which they could base a verdict. Consequently, the court concludes that Fitch should not be permitted to testify as an expert and is of the opinion that the plaintiffs' motion to exclude the testimony of the defendants' expert is well taken. It, therefore

## RECOMMENDS

that the motion be granted.[5]

### E. MOTION FOR SUMMARY JUDGMENT ON ISSUES OF DAMAGES

As mentioned at the outset, plaintiffs' claim here is for unliquidated property damage and expenses which were consequential to the event that is the subject of this case. The reasonableness of these

---

4. Interesting to the court, though not determinative of the issue, Fitch could not remember that the blades and motor of the unit were tested by LaMotte, virtually in Fitch's presence, and there was no imbalance revealed.

5. The court is advised that defendants' entire case rests upon the expert testimony of Fitch. If excluded, plaintiffs would be entitled to summary judgment on their claims under the principles announced in *Celotex v. Catrett, supra.*

amounts is always subject to challenge, though throughout the discovery there has been no countervailing evidence introduced by defendants which, in any way, controverts the amounts spent by plaintiffs incidental to repairing their home at Wintergreen, Virginia.

Plaintiffs would be entitled to recover all necessary and reasonable expenses incurred as a result of the damage where, as here, the damage is less than the value of the property damaged. What is reasonable and necessary has not been defined by Virginia courts, and consequently the finder of fact must decide this based on all the facts and circumstances of the case. While it is true that there appears to be no dispute in the facts concerning the amounts actually incurred as a result of the damage, defendants would not be foreclosed from presenting evidence or argument addressing the reasonableness of the expenses since Virginia law relegates such determination to the trier of fact.[6]

Therefore, this court

## RECOMMENDS

that plaintiffs' motion for summary judgment on the question of damages be overruled.

## SUMMARY

In summary, the court

## RECOMMENDS

that the presiding District Judge deny defendants' motion to dismiss Count II of the amended complaint, grant plaintiffs' motion for summary judgment on Counts I and II of the amended complaint, sustain plaintiffs motion to exclude defendants' expert and deny plaintiffs' motion for summary judgment on the issues of damage, reserving only the question of damages for trial which is now set before a jury.

The Clerk is directed to immediately transmit the record in this case to the Hon. James H. Michael, Jr., United States District Judge. Both sides are reminded that

pursuant to Rule 72(b) they are entitled to note objections, if any they may have, to this Report and Recommendation within (10) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objection. The Clerk is directed to send a certified copy of this Report and Recommendation to all counsel of record.

May 22, 1990
Date

---

**6.** Even if the plaintiffs had been entitled to a judgment by default, they would have been required to prove their unliquidated damages. See Rule 55(b)(2) Fed.R.Civ.Pro.